**Michael B. SMITH and Linda L. Smith, Appellants (Plaintiffs Below),**

v.

**Dewayne L. HULL, M.D., Appellee (Defendant Below).**

No. 02A04–9411–CV–442.

Court of Appeals of Indiana.

Dec. 15, 1995.

**186**

Robert E. Saint, Saint, Thoms, Whitney & Courter, Indianapolis, for appellants.

Mark W. Baeverstad, Hunt Suedoff Borror & Eilbacher, Fort Wayne, for appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Michael and Linda Smith appeal from the jury's verdict for Dewayne L. Hull, M.D. in their suit against Dr. Hull for medical malpractice.

We affirm.

### ISSUE

Whether the trial court erred in instructing the jury on the issue of contributory negligence.

### FACTS

The evidence most favorable to the verdict reveals Dr. Hull, a plastic surgeon, formed a business entity known as Hair Research Associates in Fort Wayne for the purpose of injecting prosthetic human hair into the scalps of patients suffering from male pattern baldness. Dr. Hull obtained the human hair from a Mr. Ho in Chicago who, in turn, harvested the hair from Indonesia—where women commonly wear their hair long. The hair was then decorticated (the cuticle was removed) to provide for maximum manageability. Thereafter, the hair was cleansed and dyed. Dr. Hull anesthetized the patient's scalp, and a cosmetologist injected the prosthetic hair using a special instrument.[1]

Smith, who lived in Brown County, heard about Dr. Hull's procedure through an acquaintance. Thereafter, in approximately April or May of 1979, Smith, who was wearing a hairpiece, visited Dr. Hull's office for an initial consultation where he received and read a pamphlet entitled "Hair Injection Booklet." The booklet indicated the appearance life of injected hair was three years, depending upon the patient's care of the hair, and that a "certain amount" of annual replacement would be necessary. (R. 383). Dr. Hull discussed the procedure with Smith explaining that he was one of a very few people in the world who did the procedure.

---

1. The process at issue in this case is not to be confused with hair plugs—the removal of tissue and hair from a patient's own head which is then surgically relocated to the bald spot.

Dr. Hull reviewed each paragraph of a hair injection procedure consent form with Smith.

Smith returned to Dr. Hull's office in July of 1979, for another consultation. He received a packet of information entitled "Information on Hair Replacement." (R. 282). The material discussed the cause of male pattern baldness as well as the causes of hair loss in general with a focus on two "methods available for restoring hair to the scalp:" hair plugs and injections of human hair. The advantages and disadvantages of each method were discussed. With respect to the human hair injections, the material described the manner in which the hair is injected, and pointed out that "there is no guarantee that the injected human hair will last for any specified period of time. . . ." (R. 282). A list of possible symptoms and side effects, which were to be immediately reported to Dr. Hull's office at any time of day, was included. Post-operative instructions and hair care instructions completed the packet of information. Smith conceded he read all of the material provided to him by Dr. Hull. Additionally, Smith read and signed a consent form which stated in pertinent part:

> It has been explained to me that I am having HUMAN HAIR, with the outer layer (cuticle) removed, inserted into my scalp. I understand that this procedure has only been done for a little over 1 year and only by a limited number of people. I have been informed that no one can assure me as to exactly how long the hair will remain looking aesthetically good.
>
> I have received no expressed or implied warranty as to how long it will be before the hair may discolor or break off.
>
> I understand that there yet may be a possibility of my scalp becoming allergic to the injected hairs and if this occurs the hair might have to be removed in order for my scalp to heal.

(R. 390). Thereafter, Smith paid a $1,250.00 downpayment and scheduled the injection procedure for September 20, 1979.

Upon Smith's September return to Dr. Hull's office, he signed another consent form, paid the $1,270.00 balance owed, and received the hair injections. Our review of Smith's medical records indicates he received approx-imately nineteen hair injection fill-ins over the next five and one-half years; the last fill-in took place on March 11, 1985. Despite the fact Smith received approximately thirty-two prescriptions for antibiotics, twenty-nine prescriptions for pain, and thirteen prescriptions for swelling during that time (for which he paid a total of $2,421.17), he nevertheless testified that he was pleased with the appearance of his hair injections. His satisfaction is further reflected in Dr. Hull's office records as follows:

10/05/79 Doing very well.

11/19/79 Pt. phoned. No problems.

01/28/80 Bob Von Ruchman called in for pt. Said he was doing excellent. . . .

02/13/80 Pt. called in. Says he has no problems with hair and scalp. Doing very well.

—/28/80 Pt. called. Says he is still very much pleased.

05/27/80 Pt. stated he was very pleased with injections.

02/23/81 Called in. Doing fine.

03/16/81 Says scalp is doing well. No problems with hair.

07/20/81 Pt. called in to report he was doing excellent.

08/07/81 Pt. called in to office, said he was excellent. . . .

03/02/82 Doing fine having no scalp problems.

04/16/82 Mike called to say he was doing fine, looks better than it ever has. . . .

11/22/82 Mike called in. Doing very well.

02/17/83 Mike called in. Doing fine.

03/16/83 Mike called in. Doing very well. He said this is the best his scalp has ever been. Also was impressed with the hair. Stays in longer and appears to be better quality.

07/05/83 Mike called in. Doing well.

08/29/83 Mike called in. Doing fine.

12/12/83 Mike called in doing fine.

01/31/84 Mike called in. Doing very well. May like some more in part area.

03/05/84 Patient called in. Doing excellent.

08/13/84 Mike called in. Doing fine. He would like hair injected lower in left

part area. I told him this may create problems. He wants to discuss scalp reduction.

(R. 208). Because he was so pleased with the hair injection process, Smith also indicated to Dr. Hull that he wanted to write an article or book about the hair injection procedure. Furthermore, Smith developed a "friendly relationship" with Dr. Hull. (R. 470). Smith visited Dr. Hull's Brown County cabin for scalp check-up's on three or four occasions over the years, and he took gifts to Dr. Hull's office. Indeed, because of this good relationship and his empathy for Smith's position, Dr. Hull only charged Smith $2,500.00 for the initial hair injections, plus an additional $314.00 over the years for fill-ins and supplies, and did not bill Smith for the subsequent scalp reductions he performed upon Smith which are discussed *infra.*

Each time Smith visited Dr. Hull's office for a fill-in, he was required to sign a witnessed and notarized consent form. The substance of the first two consent forms Smith signed is reproduced above. Later, Dr. Hull created a new consent form which states in pertinent part:

*WARNING WARNING WARNING*

THERE ARE CERTAIN RISKS ASSOCIATED WITH THE INJECTION OF PROCESSED HUMAN HAIR. YOU MUST ACKNOWLEDGE YOUR UNDERSTANDING AND APPRECIATION OF THE RISKS BEFORE PROCESSED HUMAN HAIR IS INJECTED.

\*     \*     \*     \*     \*     \*

*INFECTIONS AND OTHER COMPLICATIONS CAN OCCUR* especially during the first three (3) to four (4) months after injection. Infections and other complications can occur at other times also.

*SPECIAL CARE OF THE SCALP AND INJECTED PROCESSED HUMAN HAIR IS REQUIRED* ... [t]here is no expressed or implied warranty as to the length of time the results of the procedure will last.

*IN THE EVENT OF INFECTION, PROMPT MEDICAL ATTENTION IS*

*ESSENTIAL* ... [c]ontinued faithful adherence to prescribed medications and instructions is necessary to eliminate infections.

*WARNING!* Scarring may result ... there is no assurance given that some minimal scar-like manifestations may not result from the processed human hair injection if infection should occur.

\*     \*     \*     \*     \*     \*

*I UNDERSTAND DR. HULL AND HIS STAFF* will do their best ... [h]owever, if it does not work out I may have to have the injected processed human hair removed, or if I have an allergic manifestation ... or develop an infection characterized by swelling, some pus formation and scar formation, I understand I have been warned these things could occur.

*ALSO, COSMETIC SURGERY, INC. AND DR. D.L. HULL* do not feel they should be required to make any monetary or other restitution if the process does not work out for me.

\*     \*     \*     \*     \*     \*

*DR. D.L. HULL AND HIS STAFF HAVE INFORMED ME THIS PROCEDURE OF INJECTED PROCESSED HUMAN HAIR* is still considered by most medical standards to be new and is not well understood by the majority of the medical profession. However, I appreciate everything attempted in medicine is new at one time in its history. This is not something one can try in the laboratory. It can only be done by clinical application (actually performed on people).

*I UNDERSTAND DR. D.L. HULL CANNOT GUARANTEE RESULTS.* Dr. D.L. Hull has assured me he will do his best to make my hair injection result a good one.

THE OBVIOUS ALTERNATIVES TO HAVING PROCESSED HUMAN HAIR INJECTED INTO THE SCALP ARE:

1. To remain without hair.

2. To wear one of the many hairpieces available.

3. To have hair plugs done.

4. To have some type of suture procedure which is designed to try to hold artificial hair on the scalp.

\*     \*     \*     \*     \*     \*

I INDICATE BY MY FOLLOWING SIGNATURE I HAVE READ AND UNDERSTOOD THE TWO (2) TYPEWRITTEN PAGES ENTITLED "CONSENT TO INJECTION OF PROCESSED HUMAN HAIR." I ALSO HAVE HAD ALL MY QUESTIONS REGARDING THE PROCEDURE OF INJECTION PROCESSED HUMAN HAIR INTO MY SCALP ANSWERED BY DR. D.L. HULL AND/OR HIS STAFF.

I FULLY UNDERSTAND THERE ARE NO EXPRESSED OR IMPLIED GUARANTEES MADE TO ME ABOUT THE PROCESS OR MATERIALS USED IN HAIR INJECTION. THERE IS NO WARRANTY THAT I WILL NOT HAVE A FOREIGN BODY REACTION THAT COULD END IN INFECTION OF MY SCALP.

I WISH TO HAVE THE HAIR INJECTION PROCEDURE PERFORMED AND I SO ATTEST BY SIGNING THIS CONSENT FORM WITH WITNESS.

(R. 134).

During 1979, the Food and Drug Administration began an investigation of synthetic hair injections. An FDA agent visited Dr. Hull's office and was surprised to learn that Dr. Hull injected human hair as opposed to synthetic. The FDA agent told Dr. Hull that he was investigating synthetic hair injection procedures, but wanted to learn more about the human hair procedure. Dr. Hull showed the FDA representative his facilities and explained the procedure. Dr. Hull heard nothing more from the FDA until he became aware of an impending FDA ban on synthetic hair injections in 1983. The FDA materials substantively discussed synthetic hair injections, but nevertheless listed human hair injections as part of the proposed ban.

Thereafter, Dr. Hull ceased accepting new hair injection patients and consulted an attorney about the current patients who were happy with the procedure. Because Dr. Hull was concerned he would be sued for abandoning the current patients, the attorney suggested Dr. Hull discuss the FDA's position with each patient and allow each patient to determine whether or not he would like to continue receiving injections. To that end, on June 22, 1983, before the scheduled fill-in was performed, Smith signed the following:

It was explained by myself to Mike that the Federal Drug Administration (FDA) has officially gone on record as saying the 'processed human hair' has no benefit and may be harmful to the scalp. I instructed this to Mr. Smith in the presence of Sandy Camp and he wished to proceed.

(R. 166).

Sometime in 1985, Dr. Hull and Smith began discussing scalp reduction procedures. During a scalp reduction, the doctor removes a certain amount of skin from the patient's bald spot, draws the remaining skin together, and stitches the wound closed. Dr. Hull explained to Smith that the procedure required a flexible scalp for best results, and suggested Smith allow the processed hair to fall out and then wait an additional four to six months before beginning a series of scalp reductions. Because Smith did not wish to appear bald, he insisted on beginning the procedure. Dr. Hull explained to Smith that because of the hair injections, he would not be able to "undermine" (lifting the scalp away from the head) Smith's scalp as much as he would have liked because of blood supply concerns.

Dr. Hull explained to Smith that approximately five scalp reductions would be necessary to achieve the desired results. Prior to each reduction surgery, Smith signed a consent form which provided in pertinent part:

*I AM AWARE THAT* the practice of medicine is not an exact science and *I ACKNOWLEDGE* that no guarantees have been made to me as to the results of the procedures to be performed. *I AM AWARE THAT* there are risks, consequences and complications associated with all surgery and medical treatment, including the medical treatment contemplated. *I UNDERSTAND THAT SOME OF THE RISKS, CONSEQUENCES AND COMPLICATIONS ARE:*

*DESPITE DUE CARE BEING EXER-CISED* the procedure may not be successful: that the resulting appearance of the scarred areas operated upon may not be fully as I desire and that in some instances infection or keloid formation would occur and *they could be the same or worse than they would have been before surgery.*

*I UNDERSTAND THAT* it is not possible to make scars disappear once they are present but scar revision, if reasonably successful, may greatly minimize the appearance of the scar to the average observer.

\*    \*    \*    \*    \*    \*

*I UNDERSTAND THAT* the duration of the improvement resulting from the surgical procedure cannot be accurately predicted.

(R. 426) (emphasis in original). Dr. Hull eventually performed eight or nine scalp reductions upon Smith over the next approximately two and one half years.

Smith became dissatisfied with Dr. Hull's treatment, apparently because of his scarred scalp, and in 1987, he consulted another plastic surgeon who suggested a different surgical treatment. However, Smith did not have that surgery performed. Eventually, Smith consulted Dr. Kabaker, a plastic surgeon from California who specializes in pioneering new procedures for the treatment of male pattern baldness. Dr. Kabaker, who testified at trial through a video deposition, recommended still another surgical procedure and opined that Dr. Hull had been negligent in injecting the human hair into Smith's scalp and for not sufficiently undermining Smith's scalp when he performed the scalp reductions. Smith did not submit himself to Dr. Kabaker's recommended surgery either, and resumed wearing a hairpiece.

Pursuant to Indiana's Medical Malpractice Act, Smith presented his case against Dr. Hull to the Indiana Department of Insurance. On May 14, 1992, the Medical Review Panel appointed to review Smith's case rendered its opinion as follows:

The panel is of the unanimous opinion that the defendant failed to meet the applicable standard of care as charged in the complaint and that such conduct was a factor of the resultant damages.

(R. 434). Smith and his wife, Linda, thereafter filed a medical malpractice action in the Allen County Circuit Court. At trial, Smith, who was wearing a hairpiece, showed the jury his scarred scalp[2] and testified that his life has changed because of the scars: "I have friends that have swimming pools and want to do outdoor activities, and we don't do them ... [because] I'm wearing a hairpiece and just can't do that, I mean, feel comfortable doing it." (R. 497). Furthermore Smith experiences "the self-consciousness of dealing with people," and does "not feel comfortable with being around a group of people." (R. 497). The jury found for Dr. Hull and against Smith and Linda.

### DECISION

Smith claims the trial court erred in instructing the jury on the issue of contributory negligence. Specifically, the trial court instructed the jury as follows:

The Plaintiff has the burden of proof to establish his claim of medical malpractice. The Plaintiff must establish by a preponderance of the evidence:

1. The doctor's applicable standard of care;

2. The failure of the doctor to exercise the requisite standard of care; and

3. That the doctor's failure to exercise the requisite standard of care proximately caused the Plaintiff's injuries and damages.

As I have stated, the Plaintiff must establish each of these elements by a preponderance of the evidence and the Defendant has no burden of disproving them.

However, the Defendant has asserted the specific defense of contributory negligence. If the Plaintiff, Michael B. Smith, was himself guilty of negligence that proximately contributed to his injuries, then

2. While the record reveals photographs of Smith's head on several occasions apparently after hair injection fill-ins, the record fails to reveal a photograph of the scarring for which Smith claims relief. He did, however, remove his hairpiece to allow the jury to view his scalp.

Plaintiff cannot recover even though the Defendant may have been negligent.

The Defendant has the burden of proof of establishing the defense.

(R. 63). The trial court also gave the following instruction, which provides:

It is the duty of the patient to use such care as a person of ordinary prudence would ordinarily use in circumstances like his own, and if the patient fails to do this, and the failure is a proximate cause of the injuries for which he seeks to recover, he cannot hold the physician answerable for the consequences of the patient's own lack of ordinary care.

If you find that Michael Smith failed to exercise reasonable care, which failure proximately resulted in the injuries for which he seeks damage, your verdict should be for Dr. Hull even though Dr. Hull may have been negligent.

(R. 98).

■ In considering whether any error results from the giving or refusal of instructions, we consider: 1) whether the tendered instruction correctly states the law, 2) whether there is evidence in the record to support giving the instruction, and 3) whether the substance of the instruction is covered by other instructions which are given. *Wal-Mart Stores, Inc. v. Blaylock* (1992), Ind. App., 591 N.E.2d 624, 626.

Smith takes issue with the second of this three-prong test arguing "there was insufficient evidence within the record to support the giving of Plaintiff's Final Jury Instruction No. 4, as modified, and Instruction No. 8(a)." Brief of Appellant at 8. Citing *Fall v. White* (1983), Ind.App., 449 N.E.2d 628 and *Harris v. Cacdac* (1987), Ind.App., 512 N.E.2d 1138, Smith argues a patient has a duty to exercise reasonable care in only two instances: 1) in providing the doctor with accurate and complete information regarding his or her condition, and 2) in following the doctor's instructions for further care or tests. Smith claims the record indicates neither of these two instances existed and, therefore, the trial court erred in instructing the jury on the issue of contributory negligence.

We agree that in *Fall*, this court determined a patient has a duty to provide his or her doctor with accurate medical information. We also agree that in *Harris*, this court stated that a patient has a duty to follow the instructions of his or her doctor. However, in each of these cases, the patient's duty was established against a backdrop of the circumstances surrounding that particular case, and we find no authority in either case for the proposition that a patient only has a duty to exercise reasonable care in these two limited instances.

■ Rather, the rule of contributory negligence in malpractice actions, as set out by our supreme court in *Memorial Hospital of South Bend, Inc. v. Scott* (1973), 261 Ind. 27, 300 N.E.2d 50, 56, and as applied to the circumstances in *Fall*, is as follows:

The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, *which falls below the standard to which he is required to conform for his own protection.*

(Citations omitted) (emphasis in original).

■ Applying this rule to the facts before us, we find the evidence is sufficient to support the trial court's instruction of the jury on the issue of Smith's contributory negligence. Smith, who lived in Brown County, sought out Dr. Hull, who practiced in Fort Wayne, and the human hair injection procedure. Smith was given extensive literature which described the procedure and instructed him on proper post-injection hair and scalp care. Before submitting himself to the hair injection procedure, he attended two initial consultations where he spoke with Dr. Hull who reviewed the risks of the procedure as outlined on the consent form.

Smith signed a consent form, which warned of the risk of infection and the resultant scarring, each time he received a fill-in. Nevertheless, despite numerous infections and complications for which prescription

medications cost him $2,421.17, Smith continued to drive to Fort Wayne and undergo the fill-in procedure for approximately five and one-half years because he was pleased with the appearance of his hair. Smith even continued with the fill-ins after being warned that the FDA considered hair injections to be harmful to the scalp.

As to the scalp reduction procedures, Smith did not heed Dr. Hull's advice that because of his apparently inflexible scalp, he should allow the hair injections to fall out and give his scalp a four to six month rest period before beginning the series of scalp reductions. Instead, Smith, who did not want to appear bald, insisted that Dr. Hull proceed with the surgeries, and even signed a consent form prior to each reduction which contained the following language:

> the resulting appearance of the scarred areas operated upon may not be fully as I desire and that in some instances infection or keloid formation would occur and *they could be the same or worse than they would have been before the surgery.*

(R. 426) (emphasis in original). Furthermore, despite the fact Dr. Hull originally stated five reductions would be necessary, Smith eventually submitted himself to eight or nine scalp reductions before seeking a second opinion. During the eight and one-half years Smith underwent these hair replacement procedures, he only paid Dr. Hull a total of $2,814.00 for his services.[3]

▆ In order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. *Harris, supra* at 1139–40. The contributory negligence must unite in producing the injury, being simultaneous and cooperating with the fault of the defendant and entering into the creation of the cause of action. *Id.*

Our review of the evidence leaves us with little doubt that Smith's desire to sport a full head of hair motivated him to pursue remedies that he knowingly undertook at his own peril. This set of facts and circumstances gives rise to the inference that not only did Smith fail to exercise the degree of care that

an ordinary reasonable man would in like or similar circumstances, but that his actions also simultaneously united with the negligent actions of Dr. Hull to produce his scarred scalp.

Because our standard of review for sufficiency of the evidence prohibits us from reweighing the evidence or judging the credibility of witnesses, we must decline Smith's invitation to reweigh the evidence in his favor. The evidence is sufficient to support the trial court's jury instructions on the issue of contributory negligence. Accordingly, we find no error.

Affirmed.

CHEZEM, J., concurs.

SULLIVAN, J., concurs in result with separate opinion.

SULLIVAN, Judge, concurring in result.

I agree with the majority that the giving of an instruction on contributory negligence was not reversible error in this case. I write separately, however, because of my concern that the majority's approach might be construed as embracing a more expansive view of a patient's duties within the physician-patient relationship than has generally been recognized, and I cannot endorse such an expansion.

As an initial matter, I agree with the majority that the cases of *Harris v. Cacdac* (1987) Ind.App., 512 N.E.2d 1138, *trans. denied* and *Fall v. White* (1983) Ind.App., 449 N.E.2d 628 do not evince a specific intent to limit a patient's duties in all respects within the physician-patient relationship to providing complete information and following a doctor's instructions. Indeed, I agree that with respect to his actions taken while under a physician's care, a patient owes himself a duty of due care which extends beyond these narrow categories. However, this duty does not extend to diagnosing his own condition or questioning his physician's diagnosis of his condition. In fact, quite the contrary ap-

---

**3.** Dr. Hull testified that he usually charged between three and four hundred dollars for a single scalp reduction surgery. However, as noted, he did not charge Smith, nor did Smith pay, for the scalp reduction surgeries.

pears to be true; the fiduciary nature of the physician-patient relationship and the special skill of the physician bestow upon the patient the right to rely upon his physician's diagnosis and treatment. *See* 61 Am.Jur.2d *Physicians, Surgeons, and other Healers* § 303 (1981). "Since the patient may rely on the directions of his physician, it follows that he incurs no liability by doing so." *Id.* Rather, the patient's duties to himself would appear to extend to his engagement in "everyday"-type activities; or in other words, activities which, though perhaps undertaken while at a hospital or under a physician's care, are not themselves related to the diagnosis or treatment of the patient's condition. For example, *Memorial Hospital of South Bend v. Scott* (1973), 261 Ind. 27, 300 N.E.2d 50, the case which the majority cites as stating the scope of a patient's duties, Maj. Op. at 191, is itself such a case. There, the patient's action which was alleged to be in contravention of a duty owed to himself was mistakenly turning on a bedpan flusher spout instead of the toilet flusher which the plaintiff was seeking to use. 300 N.E.2d at 52. I have not discovered, nor is there present in either the majority opinion or the briefs of the parties (despite citation in the briefs to numerous cases from a variety of jurisdictions), any case law for the proposition that a patient has a duty to question his physician's diagnosis of his condition or seek, of his own accord, a second opinion.[4] Thus, while I agree that a patient's duties to himself while under a physician's care may extend beyond merely providing truthful and complete information to the physician and heeding the physician's instructions, and to the exercise of due care

in his conduct of lay activities, I respectfully disagree with any reading of the majority opinion which infers that a patient has a general duty, with respect to the diagnosis and treatment of his condition, beyond those two areas. "[B]ecause of the doctor's ability to understand and interpret medical matters, the doctor generally owes a greater duty to his patient than the patient owes to himself." *Morrison v. MacNamara* (1979) D.C., 407 A.2d 555, 567.

Despite this, upon the particular facts of this case, I am able to agree that Smith's actions could constitute contributory negligence. The reciprocal side of a patient's right to rely upon his physician's diagnosis and advice is the idea that the patient, not being a physician, cannot ascertain for himself the nature and cause of his medical condition. However, where the patient seeks to make a decision to direct a specific treatment for himself, he is no longer relying in a fiduciary sense on his physician, and could be said to "assume" a greater duty upon himself than would otherwise exist. In 61 Am.Jur. *Physicians, Surgeons, and other Healers, supra* § 303, titled "Particular acts as constituting contributory negligence", this proposition is stated:

"It seems that where a patient is fully cognizant of the nature of the specific treatment that he is about to get, or if he actually directs a specific act, such as an operation, which should not be performed, he cannot complain later that such treatment or act constituted malpractice for which he should recover. In that case he

4. Notwithstanding Dr. Hull's assertions in his brief, *Hanley v. Spencer* (1941), 108 Colo. 184, 115 P.2d 399, does not support this proposition. In that case, the plaintiff discontinued his treatment with the defendant physician and went on an extended trip to another state without informing the defendant physician, returning for care only several months later. A duty to either return for treatment, or, *if the patient chooses not to return for treatment,* to seek another opinion, is another of the duties a patient may have within the physician-patient relationship. *See* 61 Am. Jur.2d *Physicians, Surgeons, and other Healers, supra* § 303 (citing *Hanley*); Annotation, *Contributory negligence or assumption of risk as a defense on action against physician or surgeon for malpractice,* 50 A.L.R.2d 1043, 1055 (1956 &

Later Case Service 1987) (citing *Hanley*); *see also* 19A Am.Jur. *Pleading & Practice Forms* Form 396 (Rev. ed. 1985) (pattern jury instruction on "[p]atient's contributory negligence— [f]ailure to return for treatment"). Where a plaintiff continues with a course of treatment prescribed by a physician, however, that plaintiff is not under a duty to seek a second opinion.

A patient may also have a duty, when so advised by his physician, to seek a second opinion. *See* 61 Am.Jur.2d *Physicians, Surgeons, and other Healers, supra* § 302; *see also* 19A Am.Jur. *Pleading & Practice Forms, supra* Form 397 (pattern jury instruction on "[p]atient's contributory negligence—[f]ailure to follow physician's advice to consult another physician for further care").

has sought to rely on his own judgment rather than that of the physician...."[5]

Here, it appears that Smith was fully aware of the risks of both the hair replacement and scalp reduction procedures, and actually directed the performance, despite Dr. Hull's reluctance, of the scalp reductions. The complications related to the performance of the scalp reductions appear to have resulted from the inability of Dr. Hull to "undermine" Smith's scalp, which occurred due to Smith's unwillingness to wait the recommended time for his scalp to regain its flexibility. Under this factual scenario, I cannot say that there was no evidence in the record to support the giving of an instruction upon the issue of Smith's contributory negligence.

I wish to reiterate that I do not mean to imply support for a more expansive view of the scope of a patient's duties relative to the diagnosis and treatment of his condition; rather, in my view, this is one of the very rare cases where, based upon a thorough understanding of the risks and alternatives available, a patient has sought to pursue a course of treatment that has led to injuries which he knew were possible.[6] Under the particular factual scenario presented here, I agree with the conclusion reached by the majority.

---

5. This proposition is admittedly problematic if applied strenuously in medical situations where the patient's health is at stake prior to seeking treatment. In those circumstances, it is vitally important that a physician not escape liability upon the ground that a patient elected or sought a particular course of treatment, when it is the physician's very function and duty to know what is the most appropriate course of treatment. However, it may have somewhat greater force where, as here, we are dealing merely with nonessential, cosmetic procedures. In such circumstances, where the decision to seek treatment in the first place is itself elective, it seems less troubling to say that a patient could, if he chooses, exercise a somewhat greater degree of control and have greater input into the decision-making process affecting his treatment.

6. It is the same sense that Smith, being fully aware of the risks of both the hair injection and scalp reduction procedures, nevertheless chose to proceed and directed Dr. Hull to proceed with the procedures, that leads me to believe that this case might more appropriately be analyzed under an assumption of risk approach. Unlike contributory negligence, which connotes a careless disregard for a risk, assumption of risk connotes a voluntary assumption of a risk the nature and extent of which is fully appreciated. *See Kroger Co. v. Haun* (1978), 177 Ind.App. 403, 379 N.E.2d 1004; 57A Am.Jur. *Negligence* § 815 (1989). Smith's actions in this case, as opposed to being of a careless and unappreciating nature such as would normally be associated with contributory negligence, were certainly voluntary and motivated by his desire to stem or reverse the baldness he was experiencing. Further, analysis under the assumption of risk doctrine eliminates the need for an examination of whether the plaintiff's actions constituted a proximate cause of his injuries. *See* 57A Am.Jur. *Negligence, supra* § 818.

I am aware of the perils of this approach, however. Generally, and with good reason, courts are reluctant to apply the assumption of risk doctrine to the patient within the physician-patient relationship, on the theory that, given the inherently unequal nature of the relationship and the special knowledge and training of the physician, a patient cannot fully appreciate the risks of a given procedure, and thus cannot assume the risks of that procedure. *See Morrison, supra,* 407 A.2d at 566; *see generally* Comment, *Contributory Negligence in Medical Malpractice: Are the Standards Changing to Reflect Society's Growing Health Care Consumerism?* 17 U.Dayton L.Rev. 151 (1991), and cases cited therein. Indeed, it is said that a plaintiff cannot assume the risk of a physician's negligence, *see* 61 Am.Jur.2d *Physicians, Surgeons, and other Healers, supra* § 304, and I agree that merely signing a consent form and having a procedure explained by the physician does not evidence a plaintiff's assumption of risk, especially with regard to whether a procedure was negligently performed.