ROBB, Judge,
dissenting
I respectfully dissent from the majority opinion. I believe that the majority opinion departs from already established standards set by this court in medical malpractice ac *1149 tions. Based on a review of our contributory negligence jurisprudence in medical malpractice actions, it is clear that a contributory negligence instruction is warranted only if two prerequisites are met. First, there must be some evidence that any action or inaction on the part of the patient fell below a standard of reasonableness. As the majority notes, “[t]he general rule on the issue of the plaintiffs contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances.” Memorial Hospital of South Bend, Inc. v. Scott, 261 Ind. 27, 300 N.E.2d 50, 56 (1973). To conclude that a patient engaged in conduct, ‘X’, without evidence that the patient negligently did ‘X’ is not enough to warrant a contributory negligence instruction. See J.C. Penney Co., Inc. v. Wesolek, 461 N.E.2d 1149, 1151 (Ind.Ct.App.1984) modified on other grounds by 465 N.E.2d 763 (Ind.Ct.App.1984) (holding that in order to issue an instruction on contributory negligence, the evidence must show that the plaintiff did not act as a reasonable person would have acted in the same position), trans. denied. There is simply no danger of reweighing the evidence in such a case because there is no evidence to reweigh. Again, when reviewing a trial court’s issuance of an instruction, this court must determine whether there is any evidence to support the instruction. Thus, while negligence is ordinarily a question for the jury, in the case of an instruction, such a determination is within the province of this court when only one reasonable inference can be drawn from the evidence. See Leppert Bus Lines, Inc. v. Rayborn, 133 Ind.App. 325, 182 N.E.2d 260, 263 (1962) (holding that the question of contributory negligence does not become a question of law for the court unless only one reasonable inference or conclusion can be drawn from the evidence). Accordingly, when, as a matter of law, the defendant has not presented any evidence that the conduct of the plaintiff fell below a standard of reasonableness, a contributory negligence instruction is unwarranted.
Second, the action or inaction in question must have united with the physician’s negligence in producing the injury, being simultaneous and cooperating with the physician’s fault. See Smith v. Hull, 659 N.E.2d 185, 192 (Ind.Ct.App.1995), trans. denied. In a failure to diagnose case in which the patient complains of a loss of chance of survival, identifying the injury can be difficult. In this case, Mrs. King alleges that her chances for survival dropped from eighty percent (80%) to twenty percent (20%) by the time she stopped seeing Dr. Clark. I conclude that Dr. Clark’s period of liability stopped when Mrs. King decided to stop seeing Dr. Clark as her physician. Any subsequent conduct on Mrs. King’s part which, for example, decreased her chances for survival below twenty percent (20%) goes to the issue of mitigation of damages because such conduct could not possibly cause the original injury, that is, the initial decrease from eighty percent (80%) to twenty percent (20%). In other words, it is impossible for such conduct to be a coincident cause with Dr. Clark’s alleged malpractice as Dr. Clark’s conduct and Mrs. King’s conduct contribute to two different injuries.
The majority holds that Mrs. King was contributorily negligent in: 1) waiting three to four weeks before seeking medical care when her breast became red in October 1993; 2) delaying in getting the diagnostic testing that Dr. Clark ordered after her breast was swollen; and 3) making treatment choices following her diagnosis that allegedly reduced her chances of survival. I will address each of these instances in turn, demonstrating that each fails to meet one of the prongs set forth above.

a. Delay in seeking treatment and diagnostic tests in October 1993

Mrs. King testified that her breast became sore and red in the first week of October 1993. On October 23rd, she awoke to discover her breast swollen and sore. Her testimony is as follows:
[T]he first week in October ... my left breast and that area that was firmer and harder became red and it was sore.... I tried not to worry about it because, you know, it was just fibrocystic. ■ So I was just kind of watching it for a couple of weeks and then on October 23rd I woke up in the morning and my breast had ballooned out to about at least twice as big as normal *1150 and I was completely alarmed.... It was very red clear up to my collarbone and it was hot.... I was very afraid. I just knew this was breast cancer because my mother had had it. So I called [Dr. Clark’s] office and I got in to see him pretty quickly. I don’t remember if it was that day. I think it was that day-
(R. 89). The majority argues that her failure to seek treatment as soon as her breast became red and sore amounts to contributory negligence.
Based on Mrs. King’s own testimony, she did not notify Dr. Clark of her sore breast because she was relying on Dr. Clark’s previous diagnosis of her condition. Mrs. King complained of a problem with her breast in November of 1992, January of 1998, and June of 1993. After each visit, Dr. Clark informed Mrs. King that she had fibrocystic breasts. When her breast swelled and caused her alarm, she immediately notified Dr. Clark. Even during this October 23rd visit, Dr. Clark still, failed to diagnose her condition, concluding that her problem stemmed from a breast infection. In determining whether this evidence in any way establishes that Mrs. King’s actions were unreasonable, I take heed of Judge Sullivan’s cautionary remarks regarding a patient’s duty of care:
Indeed, I agree that with respect to his actions taken while under a physician’s care, a patient owes himself a duty of due care which extends beyond these narrow categories. However, this duty does not extend to diagnosing his own condition or questioning his physician’s diagnosis of his condition. In fact, quite the contrary appears to be true; the fiduciary nature of the physician-patient relationship and the special skill of the physician bestow upon the patient the right to rely upon his physician’s diagnosis and treatment. “Since the patient may rely on the directions of his physician, it follows that he incurs no liability by doing so.” Rather, the patient’s duties to himself would appear to extend to his engagement in “everyday type activities; or in other words, activities which, though perhaps undertaken while at a hospital or under a physician’s care, are not themselves related to the diagnosis or treatment of the patient’s condition.
Smith, 659 N.E.2d at 192-93 (Sullivan, J., concurring) (emphasis added) (citations omitted) (quoting 61 Am.Jur.2d Physicians, Surgeons, and other Healers § 303 (1981)); see also Fall v. White, 449 N.E.2d 628, 634 (Ind.Ct.App.1983) (cautioning that a patient does not have a duty to diagnose his or her own condition). I believe that Judge Sullivan’s warning and this court’s caution in Fall apply to this case. Mrs. King relied on Dr. Clark’s diagnosis until her condition alarmed her. Thereafter, she immediately notified Dr. Clark of her condition. Under these circumstances and based on the record, I do not believe that Dr. Clark has presented any evidence that her actions were unreasonable. Such a conclusion is consistent with this court’s determination that the standard of reasonableness for patients should not be extended to require patients to diagnose their oxvn conditions or second-guess their physician’s diagnosis. Thus, while there is evidence that Mrs. King failed to inform Dr. Clark when her breast initially became red and sore, there is no evidence that she negligently failed to do so.

b. Delay in getting diagnostic tests

Dr. Clark claims that Mrs. King delayed getting an ultrasound and a mammogram for five weeks. When Mrs. King reported to Dr. Clark on October 23rd with a swollen breast, Dr. Clark ordered a mammogram and an ultrasound. However, the radiologist canceled these tests because Mrs. King’s breast was too sore. Accordingly, Dr. Clark ordered another test on November 13, 1993. Mrs. King did not have these tests done; rather, she transferred her care to Dr. Cross, a breast specialist, who performed a needle biopsy on November 29, 1993. Thus, the alleged five week delay actually involves two delays. The first occurred on October 23rd when the radiologist canceled the tests which were reordered on November 13. The second delay occurred on November 13 when Mrs. King decided to get a second opinion rather than undergo Dr. Clark’s tests.
Dr. Clark has not presented any evidence that the delay from October 23rd to Novem *1151 ber 13 should be considered conduct on the part of Mrs. King that fell below a standard of reasonableness. As the evidence indicates, the radiologist canceled the tests because, at the time, Mrs. King’s breast was too swollen and sore to continue with the procedure. To argue that a physician’s decision to wait and conduct diagnostic tests when they are not too painful constitutes contributory negligence on the part of the patient is incredulous. Presumably, the majority would require Mrs. King to second guess her radiologist’s medical opinion in order to comport with her proper duty of care. Independent of this erroneous standard of care, the majority has pointed to absolutely no evidence that this decision fell below a standard of reasonableness. In fact, Dr. Clark himself did not reschedule Mrs. King’s ultrasound until her third subsequent visit to him on November 13, even in spite of the fact that on October 30 Mrs. King reported to Dr. Clark that she was less sore and no longer needed pain medication. Is the majority charging Mrs. King with more knowledge regarding the impending, immediate necessity of this procedure than her treating physician?
As well, the majority can point to no evidence that Mrs. King was unreasonable in her decision to forgo the diagnostic tests on November 13, the second delay. The majority only suggests that the statistical studies on Mrs. King’s type of cancer show that the two week delay made her prognosis poorer, and therefore, her delay may have contributed to her injury, a loss of chance of survival. It seems less than fair for this court to impute such knowledge to a patient when the physician’s own negligence allegedly prevented the patient from knowing she had cancer. Mrs. King testified that she was sure that she had breast cancer; however, Dr. Clark diagnosed her condition as a breast infection. Dissatisfied with this explanation, Mrs. King decided to get a second opinion. Whether or not her cancer grew worse in the two week delay is irrelevant. The question is whether or not Mrs. King’s inaction fell below a standard of reasonableness. I am unwilling to conclude -that a patient under Mrs. King’s circumstances should be required to know the possible rate at which her cancer, of which she has no knowledge, is growing. Her failure to get Dr. Clark’s diagnostic tests resulted only from her desire to get a second opinion of her diagnosis. Based on an extensive review of the record, I can find no evidence indicating that Mrs. King’s conduct fell below a standard of reasonableness.
Moreover, Dr. Clark has not presented any evidence that Mrs. King’s actions proximately caused her damages, and therefore, he is not entitled to a contributory negligence instruction. See Memorial Hospital, 261 Ind. at 36, 300 N.E.2d at 56. Mrs. King presented evidence that while she was a patient of Dr. Clark, she suffered a loss of chance of survival. As mentioned, she alleges that as a result of Dr. Clark’s malpractice, her odds of surviving the cancer went from eighty percent (80%) in November 1992 to twenty percent (20%) in October 1993. According to the evidence at trial, Mrs. King’s odds of surviving the cancer dropped to twenty percent (20%) when her breast became inflamed on October 23, 1993. At the time of the October 23rd visit to Dr. Clark, therefore, Mrs. King had already suffered the complete injury of which she now complains.[5] Accordingly, both delays in obtaining the diagnostic tests occurred after she had suffered her injury. Thus, Dr. Clark cannot prove that Mrs. King’s conduct “unite[d] in producing the injury, being simultaneous and cooperating with the fault of the defendant.” Smith, 659 N.E.2d at 192; see also Harris v. Cac-dac, 512 N.E.2d 1138, 1140 (Ind.Ct.App.1987), trans. denied.
I find Harris v. Cacdac particularly applicable to the facts of this case. In Harris, this court held that the issuance of a contributory negligence instruction to the jury was reversible error. The patient in Harris sued her physician due to an unnecessary neck surgery. The physician successfully persuaded the trial court that because of the *1152 patient’s failure to follow all of his instructions after the surgery he was entitled to a contributory negligence instruction. This court reversed, holding:
A patient may be contributorily negligent by failing to follow a physician’s instructions. However, in order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. It must unite in producing the injury and thus be “simultaneous and co-operating with the fault of the defendant ... (and) enter into the creation of the cause of action.”
Harris, 512 N.E.2d at 1139-40 (citations omitted) (quoting 61 Am.Jur.2d Physicians and Surgeons 302, p. 449 (1981)). In addition, the Harris court stated:
Negligence on the part of the patient or of those having him in their charge, which occurs wholly subsequently to the physician’s malpractice which caused the original injuries sued for, is not a complete defense to any recovery against the physician, but serves to mitigate the damages, preventing recovery to the extent the patient’s injury was aggravated or increased by his own negligence, or those having his custody, although he is entitled to recover for the injuries sustained prior to his contributory negligence.
Id. at 1140 (quoting Annot., 50 A.L.R.2d 1043, 1055) (emphasis added). As in Harris, Mrs. King’s alleged contributory negligence occurred subsequent to her physician’s alleged malpractice. Thus, any such negligence on the part of the patient must serve only to mitigate damages. See id.
If we decide otherwise, nearly any conduct on the part of a patient at any time before death could completely bar liability in a failure to diagnose case, no matter how egregious the malpractice may be. The majority’s opinion is at odds with case law which dictates that contributory negligence occurs only when the conduct of the patient is simultaneous with the physician’s negligence in producing the injury of which the patient complains. The majority concludes, on the other hand, that a patient can contribute to a physician’s malpractice long after she is no longer even a patient of the physician. Thus, the only patients whose claims are secure from a future bar to recovery are those patients who are eventually cured or those patients who die. Moreover, any treatment decisions necessitated by a physician’s malpractice could also serve to bar liability for that same malpractice even if the patient has long since ceased contact with the defendant-physician. Such a policy is, I believe, unjust and unwise.
c. Treatment choices
Mrs. King made several treatment choices after leaving Dr. Clark’s care that the majority claims contributed to her injury. Among them are that she: 1) delayed receiving her chemotherapy treatments, 2) elected to take only four rounds of six rounds of chemotherapy, 3) elected to undergo a quadrectomy rather than a mastectomy, and 4) decided not to undergo a bone marrow transplant. The trial court justified its instruction on contributory negligence based on the latter decision of Mrs. King. I believe that the trial court was incorrect because the treatment decisions occurred after Mrs. King was no longer a patient of Dr. Clark, and therefore, any alleged malpractice must have occurred prior to Mrs. King’s treatment decisions.[6]
Again, by the time Mrs. King’s cancer was diagnosed, her chances for survival had dropped from eighty percent (80%) to twenty percent (20%). Thus, before she was able to obtain treatment, she had already suffered *1153 the damage of which she now complains. Her subsequent decisions regarding treatment, therefore, can only serve to mitigate damages. See Harris, 512 N.E.2d at 1140. Additionally, I am unwilling to conclude that Mrs. King’s decisions made her negligent when the physician allegedly placed her in the position of making such major medical decisions. For example, Dr. Lottich testified at trial that the bone marrow transplant may have provided “a possible benefit” to Mrs. King; however, she also testified that for some patients the procedure is fatal. (R. 335). Mrs. King made very difficult choices that she would not have had to consider save Dr. Clark’s alleged negligence. Again, her decisions were subsequent to any malpractice of Dr. Clark, and therefore, the instruction is eiToneous.
Nevertheless, the majority argues that the holding of Smith supports a different conclusion. The majority analogizes the scalp reduction treatments in Smith to the care provided by Dr. Clark in this case, alleging that in both cases, the malpractice occurred over a long period of time. The majority concludes, therefore, that Dr. Clark’s malpractice was not a discrete event and coincided over time with Mrs. King’s alleged negligent conduct. The majority’s analysis of Smith is erroneous for two reasons. First, Mrs. King’s treatment decisions were made after she was no longer Dr. Clark’s patient. On the contrary, in Smith, the patient’s decision to proceed with treatments were made with the defendant-physician. In fact, the physician in Smith warned the patient against proceeding with treatments in a way desired by the patient. Mrs. King never consulted with Dr. Clark regarding her treatments; thus, it is a logical impossibility that her alleged negligence in this regard cooperated simultaneously with Dr. Clark’s negligence. Furthermore, the majority’s assumption that Mrs. King’s treatment decisions made her damages worse is irrelevant to the determination of whether Mrs. King was contributorily negligent. The focus of such an inquiry is on the injury of which she now complains. As in Harris, Mrs. King’s alleged negligence which occurred after the malpractice may have made her damages worse, but it did not cause the injury of which she complains, the loss of chance of survival from eighty percent (80%) to twenty percent (20%).
Second, the medical treatments provided in Smith involved elective, cosmetic procedures. The patient in Smith decided to undergo several procedures with complete knowledge of the risks. Additionally, the procedures themselves caused the damage to the plaintiff. In the present case, Mrs. King’s treatment decisions occurred after she was damaged by Dr. Clark’s alleged failure to diagnose. The need for the treatment decisions presupposes that Mrs. King was already damaged by Dr. Clark’s alleged malpractice. To argue that a treatment decision necessitated by a party’s negligence could also join simultaneously and coincidentally with that negligence is to argue the absurd position that the cause exists simultaneously with its own effect. Thus, the majority’s analysis of Smith has absolutely no application to the facts of this case.
I conclude that the trial court abused its discretion when it submitted to the jury an instruction on contributory negligence. To conclude otherwise would dramatically change the degree of care required of patients in a medical malpractice action and would change medical malpractice jurisprudence so as to eliminate the necessity that a patient’s action or inaction must unite with the fault of the physician in creating the damages in order to act as a bar to recovery. Furthermore, I find it an incredulous and unjust rule of law to place on patients the responsibility of choosing those treatments a court will later see fit in order to preserve an otherwise valid claim against a physician. In this case, Dr. Clark produced no evidence that Mrs. King’s treatment choices affected her long term survival. In fact, the only evidence that the majority can point to regarding contributory negligence is a patient desperately trying to obtain an accurate diagnosis of cancer and thereafter trying to obtain the treatments that best addressed all of her concerns. It is not for this court and much less for a defendant-physician to prioritize a patient’s concerns when obtaining lifesaving treatments made necessary by another’s negligence. I believe the majority’s holding in this regard is violative of Mrs. *1154 King’s personal autonomy, right to privacy, and right to redress.
Moreover, a paragraph on page 1048 of the majority opinion wherein the majority discusses evidence which it believes suggests that Dr. Clark did not commit malpractice discusses an issue not before us. The intention of this discussion appears to be hr support of the trial court’s decision to issue an instruction on contributory negligence. The discussion, however,' is not relevant to the issues at hand and suggests that the majority is basing its opinion more on the belief that Dr. Clark did not commit malpractice than on whether the trial court should have instructed the jury on contributory negligence. I would agree with the majority that the issue of Dr. Clark’s liability is a question for the jury, but that is not the issue we are asked to decide today.

d. Incurred Risk

The majority applies incurred risk to medical malpractice actions absent any legal authority or reasoning. Contrary to the majority opinion, the Smith opinion did not apply incurred risk to medical malpractice.
The doctrine of incurred risk is described as follows:
The doctrine of incurred risk is based upon the proppsition that one incurs all the ordinary and usual risks of an act upon which he voluntarily enters, so long as those risks are known and understood by him, or could be readily discernible by a reasonable and prudent man under like or similar circumstances.
Kroger Co. v. Haun, 177 Ind.App. 403, 408, 379 N.E.2d 1004, 1008 (1978) (quoting Stallings v. Dick, 139 Ind.App. 118, 210 N.E.2d 82, 88 (1965)). The doctrine of incurred risk has not been applied to medical malpractice cases; however, in Judge Sullivan’s concurring opinion in Smith, he questioned whether the facts of that case would be best addressed by the assumption of the risk doctrine.[7] Smith, 659 N.E.2d at 194, n. 6. Before writing that the assumption of the risk doctrine would be more applicable to the facts of Smith, Judge Sullivan was careful to limit his analysis:
This proposition is admittedly problematic if applied strenuously in medical situations where the patient’s health is at stake prior to seeking treatment. In those circumstances, it is vitally important that a physician not escape liability upon the ground that a patient elected or sought a particular course of treatment, when it is the physician’s very function and duty to know what is the most appropriate course of treatment. However, it may have somewhat greater force where, as here, we are dealing merely with non-essential, cosmetic procedures. In such circumstances, where the decision to seek treatment in the first place is itself elective, it seems less troubling to say that a patient could, if he chooses, exercise a somewhat greater degree of control and have greater input into the decision-making process affecting his treatment.
Smith, 659 N.E.2d at 194, n. 5.
Similarly, I conclude that the doctrine of incurred risk cannot be applied where a patient is placed in the position of having to chose between different medical procedures because of a physician’s negligence. Mrs. King presented evidence that her cancer could have been detected between November 1992 and October 1993. Mrs. King presented expert testimony that during that time her chances of survival were eighty percent (80%). By October 1993, however, her chances had decreased to twenty percent (20%). Thus, if, indeed, Dr. Clark committed malpractice while Mrs. King was his patient, he caused Mrs. King’s injuries and placed her in the position of choosing between major medical procedures. I am unwilling to conclude based on these facts that Mrs. King voluntarily incurred the risk of refusing certain treatments and electing other treatments. Those decisions were for Mrs. King alone, and did not affect Dr. Clark’s alleged previous malpractice.
In summary, I conclude that the trial court’s instructions on contributory negligence and incurred risk are erroneous. I also conclude that the error was prejudicial *1155 to the outcome of the case. As the record indicates, the trial judge himself presumed that Mrs. King’s treatment choices warranted a contributory negligence instruction and an incurred risk instruction. If the trial judge erroneously presumed that such evidence could constitute contributory negligence or incurred risk, I believe it very likely the jury could arrive at the same erroneous conclusion. As an erroneous, prejudicial contributory negligence instruction warrants reversal, I would vacate the jury’s verdict and order a new trial.
The majority’s conclusion to the contrary, I believe, is erroneous in several respects. As mentioned, it misconstrues the nature of contributory negligence. Again, the question is not whether the patient engaged in certain conduct. The question is whether there is any evidence that the patient’s conduct fell below a standard of reasonableness. Second, the majority opinion ignores the nature of a loss of chance of survival complaint in medical malpractice actions. The liability of the physician necessarily ends when his care of the patient ends. The majority opinion represents a potential bar to all patients complaining of medical malpractice in a failure to diagnose case. Under the majority opinion’s analysis of this case, the only patients who could recover for a loss of chance of survival are those patients who are eventually cured or those who die. Those patients still struggling to survive are placed in the absurd and tragic position of losing an otherwise valid right to recovery by making difficult and sometimes life-threatening treatment choices which then go to the issue of liability even after the patient has had no contact with the defendant-physician. In short, the majority opinion represents a disastrous social policy which could effectively indemnify physicians from gross acts of malpractice. Whether Dr. Clark committed such malpractice is admittedly for the jury’s determination, but he is not entitled to such a determination under the auspices of a contributory negligence instruction.

. Again, in a failure to diagnose case, the liability ceases when the malpractice ends. In this case, the alleged injury is a loss in chance for survival from eighty percent (80%) to twenty percent (20%), representing the entire time that Mrs. Bang was Dr. Clark's patient. Any conduct on the part of Mrs. Kdng which decreased her chances of survival below twenty percent (20%), therefore, contributed to a different injury.

. Although I do not need to reach the issue today, I also note that Dr. Clark produced no evidence that Mrs. King was negligent in her treatment decisions. Dr. Lottich, a medical expert, testified that Mrs. King's decision to have a quadrectomy and her delay in receiving her chemotherapy did not affect her long term survival. Additionally, Dr. Cross testified that Mrs. King's decision to have a quadrectomy did not affect her chances for survival. At trial he testified: "[Mrs. King requested that] if we can do [the surgery] and save [her] breast and still have the same chances as far as living through this, then that’s what [she] would prefer to do and that’s the reason I consulted Dr. Sledge and ... his suggestion was is [sic] follow her wishes, you’re not going to really change her odds of heating this by taking her breast off versus doing a wide excisional lumpectomy....” (R. 188) (emphasis added). Finally, Mrs. King did not complete all six rounds of her chemotherapy because the treatments were making her too sick. Dr. Clark has not offered any evidence that this decision was negligent or that it made her damages worse.

. Assumption of the risk and incurred risk are similar doctrines. As stated in Whitebirch v. Stiller, 580 N.E.2d 262 (Ind.Ct.App.1991), "assumed risk differs, if at all, from incurred risk only in that assumed risk arises where there is a contractual obligation.” Id. at 265, n. 2.