**Lula M. FALL, Administratrix of the Estate of Max L. Fall, Deceased, Appellant (Plaintiff Below),**

v.

**Donald G. WHITE, M.D., Harry R. Stimson, M.D., and Ireland Road Family Physicians, Inc., Appellees (Defendants Below).**

No. 4–1181A182.

Court of Appeals of Indiana,
Fourth District.

June 9, 1983.

Rehearing Denied July 22, 1983.

Robert F. Gonderman, Gonderman Law Office, South Bend, for appellant.

David C. Jensen, Richard A. Hanning, Eichhorn Eichhorn & Link, Hammond, for appellees.

MILLER, Judge.

In this medical malpractice action, plaintiff-appellant, Lula M. Fall, Administratrix of the Estate of Max L. Fall, is appealing from both a judgment on the evidence (directed verdict) entered in favor of one defendant-appellee, Dr. Harry R. Stimson, at the close of Fall's evidence and from a later jury verdict in favor of the remaining defendant-appellees, Dr. Donald G. White and Ireland Road Family Physicians, Inc. The action arose out of the alleged negligence of the doctors which purportedly caused the fatal heart attack of Max Fall on April 11, 1973. Fall alleges there was sufficient evidence of Dr. Stimson's negligence to send the case to the jury and there was reversible error in the instructions given to the jury concerning the negligence of Dr. White. We affirm.

## ISSUES

Fall claims the trial court erred:

1. in giving final instruction number three which permitted the jury to find for the doctor if death would have occurred regardless of the type or mode of treatment,

2. in giving final instruction number ten which informed the jury Max had a duty to provide his doctor complete information and a duty to follow the doctor's instructions,

3. in giving final instruction number two which stated Fall had to prove the doctor failed to prevent Max's death,

4. in giving final instruction number eight which indicated a doctor is not negligent if he exercises reasonable care and ordinary skill even if he fails to appreciate the seriousness of his patient's problem,

5. in refusing Fall's tendered instruction number six which told the jury a doctor is not free to guess or take needless risks with the patient's well-being,

6. in refusing Fall's tendered instruction number two, which related to the alleged negligence of Dr. White in not withdrawing a prescription for Dimetapp Extentab, medicine originally prescribed for treatment of flu, and

7. in granting Dr. Stimson's motion for judgment on the evidence at the close of Fall's case.

## FACTS

White and Stimson were physicians employed by the Ireland Road Family Physicians, Inc. in 1973. Lula Fall's deceased husband, Max Fall, a well driller by profession, had been Dr. White's patient for 11 years. Although during his first visit on May 3, 1962, Max complained of "pain in his heart," the physical exam was normal, and Dr. White, diagnosing the condition as "tension with business," prescribed a tranquilizer.

Dr. White next saw Max on August 24, 1962, who then complained of lightheadedness, blurring of vision, pain in his chest, and shortness of breath—but again the physical examination was normal. In February, 1964, Dr. White recommended an EKG, but Max did not submit to the examination. However, Max did continue to see Dr. White for a variety of reasons, including his lightheadedness and chest pains.

In February, 1969, without telling Dr. White, Max went to Mayo Clinic for an examination and electrocardiogram giving a history of pain and dizziness. After an EKG showed no evidence of heart disease, Dr. Wallace A. Merritt of Mayo Clinic diagnosed Max as having a tension state with hyperventilation syndrome and recommended a psychiatric evaluation. Max neither complied with this recommendation nor took the prescribed tranquilizer. Not until March, 1970, did Max tell Dr. White about the Mayo Clinic visit.

In 1971, Max was seen by a Dr. Bernard Vagner, who, after hospitalizing Max for examination, diagnosed his condition as acute anxiety, stress reaction and vertigo. Max did not inform Dr. White of this examination.

Shortly before his death in early 1973, Max applied to purchase life insurance, which required his physical examination including a stress test. Dr. White sent Max to Dr. James Fink for a treadmill electrocardiogram on March 20, 1973. During the course of the test, Max developed multi-focal, premature ventricular contractions requiring the test be stopped. Dr. White assumed his office received the report within a couple of days. On March 25, 1973, Max, with flu-like symptoms, contacted Dr. Stimson who prescribed Dimetapp Extentab, a decongestant which constricts blood vessels; the prescription was filled that day.

Shortly thereafter, on March 29, 1973, Max consulted with Dr. White about both the flu and his stress test results. Dr. White's deposition [1] and records reveal he discussed the March 20th stress test with Max and informed him the test indicated coronary artery disease. When queried about whether he was having any chest pains or shortness of breath, Max answered in the negative. His records revealed that Max had not complained of chest pains since 1968. Dr. White advised Max he needed further evaluation, provided him with a laboratory slip to have a blood lipid profile done in the next few days and instructed him to return for an evaluation. However, Max neither had the test performed, nor did he contact Dr. White after March 29, 1973. Dr. White also advised Max to quit smoking but allowed him to go

---

1. Dr. White was deceased at time of trial. His deposition was read at trial.

back to work on his well service business, which was stressful as well as physically demanding. Dr. White did not prescribe any heart medication or send Max to a heart specialist at that time but cautioned Max that he should report to a hospital or to the doctor immediately if he experienced any chest pains. The evidence discloses Max had chest pains before he reported for work on April 11. Further, he experienced chest pains while working, rested a few minutes, then returned to work, dying shortly thereafter of a heart attack.

In her complaint, administratrix Fall alleged Dr. White was negligent by failing to prescribe medication to aid blood circulation, by failing to seek the advice of a heart specialist immediately, and by failing to limit Max's physical activities. Further, she alleged both Drs. Stimson and White were negligent in prescribing Dimetapp Extentab. She maintained a combination of these factors along with the heart disease caused Max's death.

### DECISION

A. *Court's Instruction on Proximate Cause*

■ Initially, Fall contends the court erred in giving final instruction number three on causation[2] which stated:

"You are instructed that if you find from a fair preponderance of the evidence that Max Fall's death would have occurred at about the same time regardless of the type or mode of treatment rendered by the defendant, your verdict should be for the defendant."

Fall maintains this is a misstatement of the law because the plaintiff does not have the burden to prove the recommended and proper care would have saved the life of the decedent. Fall relies on cases in which an act of nature combined with an act of negligence to produce injury. In such cases, the negligent party was liable where the negli-

gence contributed to the death. Fall cites *Childs v. Rayburn,* (1976) 169 Ind.App. 147, 346 N.E.2d 655, in support of her contention. In *Childs,* the employer was found liable for negligence in requiring his farm hand to remain, during an oncoming thunderstorm, in an open field where the boy was killed by a lightning bolt. Thus, there would have been no injury from the act of nature if the defendant had not also been negligent. However, the *Childs* court explained its decision by quoting our supreme court as follows: " '[I]f the observance of due care in providing against known dangers would not have prevented or turned aside the danger which arose and produced the injury, then, the failure to observe such care could not be regarded as a proximate cause of the injury.' " *Id.* at 152, 346 N.E.2d at 659, *quoting Watts v. Evansville R. Co.,* (1921) 191 Ind. 27, 53, 129 N.E. 315, 323. Utilizing the supreme court's reasoning, this court approved the following instruction in *Hartman v. Memorial Hospital of South Bend,* (1978) 177 Ind.App. 530, 380 N.E.2d 583

In order for the plaintiff to recover in this case, she must prove by a preponderance of the evidence not only that the defendant Memorial Hospital of South Bend breached its legal duty as I have defined it for you, but also that such breach proximately caused the plaintiff's decedent's death and the damages, if any, complained of. Plaintiff moreover may not recover because of decedent's death and damages, if any, which you find would have occurred no matter what nursing and hospital care was rendered to the plaintiff's decedent by the defendant Memorial Hospital of South Bend"

*Id.* at 533, 380 N.E.2d at 585.

Thus, if death occurs no matter what care is provided, there is no causation, and the jury should find for the defendant. We conclude the trial court did not err in the

---

2. Fall in her motion to correct errors and in her appellant's brief claimed the court erred in giving final instruction number thirteen. White in his brief defended final instruction number thirteen. In her reply brief, Fall admitted a typographical mistake, noting the number thirteen should have been the number three and further pointing out instruction number three was quoted in her brief. Fall asserts "[t]he failure to respond to an argument is, in effect, a confession of error." Because Fall invited White's error, we speak to the merits of this issue.

giving of instruction number three on proximate cause.

### B. *Court's Instruction on Contributory Negligence*

■ Fall also asserts the trial court erred in giving instruction number ten which reads:

"The patient, as well as the physician, has the duty to exercise reasonable care: the physician has a duty to his patient to exercise reasonable care in forming his diagnosis and rendering treatment while the patient has a duty to exercise reasonable care in providing the physician with accurate and complete information and following his instructions for further care or further diagnostic tests. If Max L. Fall failed to exercise reasonable care in providing Dr. White with accurate and complete information regarding his condition or in following instructions given him by Dr. White for further care or tests and such failure on Max Fall's part directly contributed to causing his death, then your verdict should be against the plaintiff, Lula M. Fall and in favor of the defendant doctor."

Fall objects to this contributory negligence instruction which informed the jury Max had the duty of exercising reasonable care both in providing his doctor with complete and accurate information and in following his doctor's instructions. Fall claims contributory negligence was not an issue in the lawsuit, and further, the instruction was a misstatement of the law and not supported by the evidence. First, we note that part G of a May 15, 1981, pretrial order enumerated the contested issues of fact which included "[w]hether acts or omissions on the part of the decedent proximately contributed to his death." Additionally, a preliminary instruction (reread as final instruction) also addressed the subject of Max's negligence as a defense and stated: "The defendants have the burden of proving this claim by a preponderance of the evidence." Finally,

Fall herself tendered an instruction, given with only slight modification, which instructed the jury:

"The defendant claims that Max Fall was guilty of contributory negligence which caused or contributed to his death. Defendant has the burden of proof on this issue.

Before you can find that Max Fall was guilty of contributory negligence, you must first find that he failed to act in a way that a reasonably prudent person would have acted under the same or similar circumstances and that such failure was a direct cause of his death.

In determining the question of whether or not Max Fall exercised the care of a reasonably prudent person, you may consider his prior medical history, his experiences with Dr. White, and the care, advice and treatment given to him along with all of the other evidence *and circumstances* in this case." (Emphasized language added by trial court.)

Under the foregoing circumstances, it is apparent contributory negligence was an issue at the trial.

With respect to Fall's claim there was no evidence of contributory negligence, we find evidence in the record Max failed to submit to the blood lipid profile—a test which Dr. White ordered after explaining to Max his heart problem on March 29, 1973, nor did he return to Dr. White, as instructed, for further evaluation. Other evidence disclosed that Max was cautioned at the March 29 examination to report immediately to a hospital if he experienced chest pains. However, on the morning of his death he complained of chest pains both before he began working and while working. In the latter situation, he rested for a few minutes and commenced working again.[3] Dr. White's deposition revealed he asked Max at the March 29 office visit if he had been having any chest pains and Max answered in the negative. Yet according to Mrs. Fall, Max complained frequently of

---

**3.** This evidence was gleaned from an accident report of the investigating police officer (Fall's Exhibit Number 7) who obtained the informa-

tion from the homeowner where Max was working on April 11, 1973.

chest pains so severe he thought he would die. Thus, contrary to Fall's assertion, there is evidence in the record both of Max's failure to follow his doctor's instructions and his failure to give complete and accurate information.

Regarding the legal correctness of the instruction, Fall does not complain of the language which instructs that a patient may be contributorily negligent if he fails to follow the physician's instructions. This principle of law is well established in this jurisdiction. *Jones v. Angell,* (1883) 95 Ind. 376; *Young v. Mason,* (1893) 8 Ind.App. 264, 35 N.E. 521; 23 I.L.E. *Physicians & Surgeons* § 18 (1970). She does object to the portion of the instruction which states "[A] patient has a duty to exercise reasonable care in providing the physician with accurate and complete information." She claims in her brief:

"A patient does not have a duty to advise the doctor. That is to say, a patient has the right to expect his physician to make inquiry of him. Under this instruction, it would appear that a patient has a duty to spontaneously advise his physician of his complete medical background.

Frequently, if not usually, patients are not learned enough to know what facts are of critical importance and which are not. They rely on their doctor to ask them what he needs to know in order to properly care for them."

Appellant's brief p. 71. However, Fall goes on to concede that:

"[i]f Max Fall had been asked a question and failed or refused to give an answer, that might constitute negligence on his part. If contributory negligence was [sic] an issue in this case, such conduct might even have constituted a defense."

*Id.*

In addressing this issue we would first note, as conceded by Fall, that the principle of contributory negligence is applicable in malpractice actions. It has been explained thusly:

"The creation of the relation of physician and patient gives rise to reciprocal duties to exercise due care: that of the physician to his patient, and that of the patient to his physician and himself in relation to the physician's treatment in endeavoring to effect a cure. Thus, it has been said that it is the duty of the patient to use such care as a person of ordinary prudence would ordinarily use in circumstances like his own, and that if he fails to do this he cannot hold the physician answerable for the consequences of his own want of ordinary care."

61 Am.Jur.2d *Physicians, Surgeons* § 302 (1981). Although we find no Indiana cases on point, we conclude the instruction in question read with the instruction tendered by Fall and given by the court with only a slight modification properly instructed the jury with respect to Max's negligence. Other jurisdictions recognize that a patient must use reasonable care in giving an accurate medical history to his physician and the failure to use such care may constitute contributory negligence. *Skar v. Lincoln,* (8th Cir.1979) 599 F.2d 253 (applying Nebraska law); *Jamas v. Krpan,* (1977) 116 Ariz. 216, 568 P.2d 1114; *Rochester v. Katalan,* (1974) Del., 320 A.2d 704; *Mackey v. Greenview Hospital, Inc.,* (1979) Ky.App., 587 S.W.2d 249, 254. In *Skar,* the plaintiff, a mental patient, was injured when he leaped into a window in the psychiatric ward. After finding evidence was presented indicating the patient gave false and incomplete information, although he was capable of providing an accurate history, the court approved an instruction on contributory negligence explaining:

"If the jury believed Skar's contention that a proximate cause of his injuries was the failure of Dr. Osborne to take appropriate precautions against self-destructive behavior, Dr. Osborne was entitled to show that such failure was contributorily caused by materially false and incomplete information furnished by Skar. Inasmuch as the theory of Skar's case depended heavily on the premise that accurate factual information about his history and behavior was essential to his psychiatric care, Skar invited an affirmative defense

that he failed to cooperate in his treatment by providing such information within his own knowledge."

*Skar v. Lincoln, supra,* at 260.

■ We acknowledge a patient does not have a duty to diagnose his own condition as he can reasonably expect the physician to ask the proper questions. However, we disagree with Fall's contention that the court's instructions commanded the jury to find Max contributorily negligent if he failed to spontaneously advise his physician of his complete medical background. Rather, the instruction in question required only that a patient has a duty to exercise *reasonable care* in providing medical information and the jury was further instructed that Max's standard of conduct was that of a reasonably prudent person under like or similar circumstances. These instructions conform to the rule of contributory negligence in medical malpractice actions set out by our supreme court in *Memorial Hospital of South Bend, Inc. v. Scott,* (1973) 261 Ind. 27, 300 N.E.2d 50:

"The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. *Bain, Admx. v. Mattmiller* (1938), 213 Ind. 549, 13 N.E.2d 712. Con-

tributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, *which falls below the standard to which he is required to conform for his own protection.* Restatement Second of Torts § 463." (Emphasis in original.)

*Id.* at 36, 300 N.E.2d at 56.[4] Based on the foregoing, we find the jury was properly instructed on contributory negligence.[5]

**C.  *Court's Instruction on Causation***

■ Fall objects to the giving of final instruction number two relating to causation. However, this instruction was also read as preliminary instruction number three without objection, and thus the error is waived. *Kranda v. Houser-Norberg Medical Corp.,* (1981) Ind.App., 419 N.E.2d 1024, *appeal dismissed* (1982) —— U.S. ——, 103 S.Ct. 23, 74 L.Ed.2d 39; *Cochrane v. Lovett,* (1975) 166 Ind.App. 684, 337 N.E.2d 565.

**D.  *Court's Instruction on Diagnosis***

■ The last instruction given by the court to which Fall objects is instruction number eight which states:

"The law does not require that a physician guarantee that he will cure his patient or even that he will obtain a good result.

4. In *Memorial Hospital of South Bend, Inc. v. Scott, supra,* at 36, 300 N.E.2d at 56, the court noted:

"[A] departure from the general rule is required where the plaintiff is suffering from physical infirmities which impair his ability to function as an 'ordinary reasonable man.'"

In the case before us, there is no claim that Max suffered from any physical infirmity rendering him unable to function as an "ordinary reasonable man."

5. We also recognize that failure to disclose could, under certain factual circumstances, preclude a finding of negligence on the part of the doctor. *Amdur v. Zim Israel Navigation Co.,* (S.D.N.Y.1969), 310 F.Supp. 1033; *Tangora v. Matanky,* (1974) 231 Cal.App.2d 468, 42 Cal. Rptr. 348; *Johnson v. St. Paul Mercury Insurance Co.,* (1969) La.App., 219 So.2d 524, 36 A.L.R.3rd 1349. In *Johnson,* for example, a hospital doctor was called upon to treat a 2½ year old child who, some nineteen hours earli-

er, had ingested aspirin. This latter fact was not revealed to the doctor by the child's parents although the father was asked specifically by the doctor whether the child had taken any aspirin, cough syrup or any other medication before he was brought to the hospital. Consequently, the doctor did not administer a test to determine the presence of aspirin and proceeded to diagnose and treat the illness as a typical case of croup. From the expert testimony the court was able to determine 1) there was no reason to believe the doctor could have discovered the problem other than being alerted to its possibility and, 2) he exercised the degree of skill ordinarily employed under similar circumstances by the members of his profession in good standing in the community and used reasonable care and diligence, along with his best judgment in the application of his skill to the case. With these findings, the court concluded the doctor was free of negligence in all respects.

The law does require that a physician possess and use that degree of skill and learning which is ordinarily possessed and used by doctors in similar practice in this or similar locations at the time of the treatment or service.

Accordingly, a doctor will not be negligent if he exercises such reasonable care and ordinary skill even though he mistakes a diagnosis, makes an error in judgment or fails to appreciate the seriousness of his patient's problem."

Fall objects to the language which instructs that a doctor will not be negligent if he fails to appreciate the seriousness of his patient's problem. This same question was addressed in *Dahlberg v. Ogle,* (1978) 268 Ind. 30, 373 N.E.2d 159, where Dahlberg, who was acutely ill with nausea, vomiting, diarrhea and occasional fever, was examined and diagnosed without the benefit of any tests. There was evidence Dr. Ogle "failed to come to a realization of the actual seriousness of Mr. Dahlberg's condition." *Id.* at 35, 373 N.E.2d at 162. Our supreme court found that failure of a physician to realize the actual seriousness of a condition is not negligence unless there are facts to indicate a lack of skill or lack of care in making the examination and diagnosis. Indiana has long recognized the principle that a physician's mistaken diagnosis does not constitute negligence when the physician has used reasonable skill and care in formulating such diagnosis. *Edwards v. Uland,* (1923) 193 Ind. 376, 140 N.E. 546; 23 I.L.E. *Physicians and Surgeons* § 18 (1970). The trial court did not err in giving instruction number eight.

E.  *Court's Refusal of Fall's Instruction on the Standard of Proper Exercise of Medical Judgment*

▮ Fall also alleges error in the refusal of the trial court to give her tendered instruction relating to a physician's exercise of judgment in treating a patient. First, we observe that, in determining whether any error results from the refusal of a tendered instruction, this court examines three factors: 1) whether the instruction correctly states the law; 2) whether there is evidence in the record to support the giving of the offered instruction; and 3) whether the substance of the tendered instruction is adequately covered by other instructions which are given. *Lewis v. Davis,* (1980) Ind.App., 410 N.E.2d 1363; *Southern Indiana Gas & Electric Co. v. Steinmetz,* (1978) 177 Ind.App. 96, 377 N.E.2d 1381. Fall tendered instruction number six on the exercise of medical judgment which read:

"In treating a patient, a physician is permitted to choose between two or more methods of treatment.

In making this choice, the physician must use his judgment. That judgment must be based upon scientific knowledge and his experience. He is not free to guess or take needless risks with the patient's well being.

In making a judgment between two or more recognized methods of treatment, the physician must elect a method recognized as proper by the profession considering all of the surrounding facts and circumstances in the patient's case."

Because it is not error for the trial court to refuse a tendered instruction when the substance of the instruction has been adequately covered by another instruction, *Lewis v. Davis, supra,* we find Fall's argument to be without merit. The court more than adequately instructed the jury on the matters in Fall's instruction by giving its instruction number nine which stated:

"In treating his patient, a physician is required to exercise his judgment. That judgment should be based upon his training and experience and an adequate knowledge of the patient's condition so as to avoid unnecessary risks to the patient's health.

Where there are two or more methods of treating a problem which are recognized as proper by physicians in similar practices at the time in question, it is not negligence for the physician to adopt any one of the recognized treatment methods.

The fact that a different treatment method was available or that a different doctor might have chosen a different treatment method is not evidence of negligence.

A physician is negligent where he selects a treatment method which is not recognized as proper by physicians with the same specialty in this or similar communities at the time in question."

The trial court did not err in refusing to give Fall's instruction number six.

**F.** *Directed Verdict in Favor of Dr. Stimson*

■ Finally, Fall asserts error in the granting of Dr. Stimson's motion for a judgment on the evidence at the conclusion of Fall's evidence. Specifically, Fall alleges Dr. Stimson was negligent in prescribing Dimetapp Extentab on March 26, 1973, for Max's flu-like symptoms. She supports her argument by citing the testimony of Dr. John Burroughs, who claimed the decongestant Dimetapp Extentab should not have been prescribed for a coronary patient such as Max because the drug constricts the small blood vessels, decreasing the flow of blood and increasing the pressure. Instead, a physician exercising ordinary skill, according to Dr. Burroughs, would prescribe nitroglycerin which causes the small vessels to dilate, increases the flow of blood, allows more oxygen to get to the tissue and has the potential of stopping some heart attacks. Dr. Burroughs testified Dimetapp Extentab should be specifically avoided in heart patients. However, in his testimony (the only expert testimony on Dimetapp Extentab), Dr. Burroughs did not comment as to any possible connection between the taking of Dimetapp and a heart attack. Dr. Burroughs was asked a number of lengthy hypothetical questions which attempted to establish the physician's diagnosis and treatment of Max proximately caused his death. He was further questioned as to Max's cause of death. No mention of Dimetapp Extentab was made in these lines of questioning. Thus, even though Fall offered evidence which would tend to show Dr. Stimson, in prescribing Dimetapp, did not exercise the skill and ordinary care used by physicians, there was no evidence relating this medication to the proximate cause of Max's lethal heart attack. This omission of an essential element was fatal to Fall's action against Dr. Stimson as it was incumbent on Fall to establish not only that Dr. Stimson was unskillful or negligent but also that his want of skill or care caused the death complained of. "If either element is lacking in her proof, she has presented no case for consideration of the jury." *Smith v. Feerer,* (1947) 117 Ind. App. 304, 306, 70 N.E.2d 770, 771 (where the plaintiff alleged negligence by her doctor in treating her right arm).

A directed verdict favorable to Dr. Stimson was proper.[6] The judgment of the trial court is affirmed.

CONOVER, J., and RATLIFF, J. (sitting by designation), concur.

---

**6.** The trial court also refused to give a portion of Fall's tendered instruction number two relating to Dr. White's alleged failure to withdraw the prescription for Dimetapp Extentab on March 29, 1973. Since we find Fall failed to connect this medication to Max's death, there was no error in refusing that portion of the instruction.