**FILED**

Oct 15 2015, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court



ATTORNEYS FOR APPELLANTS

Brian J. Hurley
Timothy Krsak
Douglas Koeppen & Hurley
Valparaiso, Indiana

ATTORNEYS FOR APPELLEES

C. Christopher Dubes
Barrett & McNagny, LLP
Fort Wayne, Indiana

Karl L. Mulvaney
Nana Quay-Smith
Jessica Whelan
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

Mark W. Baeverstad
Andrew L. Palmison
Rothberg Logan & Warsco
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John A. Hill, III and Susan Hill,

*Appellants-Plaintiffs,*

v.

Steven N. Rhinehart, M.D. and
Fort Wayne Medical Oncology
and Hematology, Inc.; John F.
Csicsko, M.D. and David P.
Lloyd, M.D., as Individuals and
Cardiovascular Associates of
Northeastern Indiana, LLC, a
Professional Corporation; and
Thomas P. Ryan, D.O.,

October 15, 2015

Court of Appeals Case No.
02A03-1405-CT-146

Appeal from the Allen Superior
Court

The Honorable Stanley A. Levine,
Judge

Cause No. 02D01-0908-CT-318

*Appellees-Defendants.*

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Plaintiffs, John A. Hill (Hill) and Susan Hill, appeal the trial court's judgment in favor of Steven N. Rhinehart, M.D. (Dr. Rhinehart) and Fort Wayne Medical Oncology and Hematology, Inc.; John F. Csicsko, M.D. (Dr. Csicsko) and David P. Lloyd, M.D. (Dr. Lloyd), as individuals, and Cardiovascular Associates of Northeastern Indiana, LLC, a professional corporation; and Thomas P. Ryan, D.O. (Dr. Ryan).

We affirm.

## ISSUES

Hill raises three issues on appeal, which we restate as follows:

(1) Whether the trial court properly granted judgment on the evidence in favor of Dr. Lloyd and Dr. Csicsko;

(2) Whether Hill was prevented from pursuing a theory of joint and several liability against all physicians by the entry of the judgment on the evidence against two of the physicians; and

(3) Whether the trial court abused its discretion in tendering Jury Instruction No. 23 and instructing the jury that physicians are not liable for an error in diagnosis or treatment when exercising reasonable care.

## FACTS AND PROCEDURAL HISTORY

On December 6, 1999, Hill was admitted to Parkview Memorial Hospital (Parkview) for a cardiac catheterization related to angina pain. Dr. Ryan, a board-certified cardiologist, performed the procedure, which revealed severe coronary artery disease with multiple blockages of two main coronary arteries. Because of the severity of the disease and Hill's risk of death from sudden heart attack, Dr. Ryan recommended immediate coronary artery bypass surgery for the following day. On December 7, 1999, Dr. Lloyd, a board-certified vascular surgeon, executed Hill's coronary bypass surgery. Hill was given the standard dose of 27,000 units of Heparin, "an anti-coagulant, used to thin the blood," which helped to "keep the blood flowing through the heart pump." (Transcript pp. 265, 292). He further received 5,000 units of Heparin subcutaneously twice a day until December 9, 1999. The coronary bypass surgery was pronounced a success and Hill was moved into the intensive care unit for recovery.

As his recovery began, Hill manifested numerous complications. Immediately following surgery, Hill experienced a "natural drop in platelets[1] as a result of

---

[1] Platelets are cell-based mechanisms that "recognize that there's been an injury and will aggregate at that site of injury" and form clots. (Tr. p. 266).

the surgery" because the "heart/lung bypass machine [used during surgery] simply 'chews up' platelets." (Tr. pp. 636, 683). Over the following day, Dr. Ryan did not see the rebound from the low platelet count that he was expecting and, as a result, on December 9, 1999, he entered an order to "[s]top all subcutaneous Heparin." (Tr. p. 637). At that point, Dr. Ryan suspected Hill to be suffering from Heparin-Induced Thrombocytopenia (HIT), which is a rare "immune mediated response to the presence of the Heparin antigen in the body." (Tr. p. 639). Usually, HIT manifests itself "about five to ten days after exposure to the Heparin." (Tr. p. 278). It "is an uncommon problem" and "mimics many other disease processes. It's very, very difficult to diagnose." (Tr. p. 1468).[2] By discontinuing all Heparin—which was the recommended standard of care for treatment of HIT in 1999—Dr. Ryan expected to see "a slow rise in the platelet count back to its normal levels within three to five days." (Tr. p. 640). Hill was not administered a non-Heparin anticoagulant as a replacement medicine, even though a non-Heparin option, Refludan, was available at Parkview. However, unbeknownst to Dr. Ryan, Hill continued to receive a minimal dose of Heparin because of Parkview's protocol that prescribed "Heparin flushes" of the IV lines. (Tr. pp. 649-50).

---

[2] In fact, during the early days of the disease in the 1980s, "many clinicians did not believe that HIT existed or HITT." (Tr. p. 1458). It was not until the late '90s and early 2000s, that the medical community "started to formulate both diagnostic criteria that everybody accepted as reasonable and therapeutic modalities that were reasonable." (Tr. p. 1459).

[6]     Dr. Ryan's anticipated bounce in platelet counts never occurred. Instead, Hill developed life-threatening complications, including Adult Respiratory Distress Syndrome (ARDS), Thrombocytopenia,[3] failure to wean from the ventilator, Moraxella infection in his lungs, high fevers, sepsis, and extreme swelling throughout his body. Based on this "constellation of symptoms" on December 13, 1999, Dr. Ryan believed Hill to be suffering from Disseminated Intravascular Coagulopathy (DIC), which is "an extremely serious condition manifested by formation of clots in blood vessels coupled at the same time with the fall in the patient's platelet count." (Tr. pp. 701, 685). However, due to the eighty percent drop in platelet count combined with a significant swelling of Hill's left arm, Hill's medical expert, Harry Jacob, M.D. (Dr. Jacob), testified that, at this point Hill's HIT had developed a Thrombosis component (HITT)[4] and Refludan, the non-Heparin anticoagulant, should have been prescribed. In 1999, Refludan was a newly approved drug which was "not strongly supported by the medical community" as it could cause severe "bleeding into the brain tissue" and no reversal agent existed. (Tr. pp. 1479, 1480). "Refludan was [later] taken off the market because its safety profile did not match what current FDA standards would require." (Tr. p. 1481).

---

[3] Thrombocytopenia indicates a low platelet count. When a patient's platelet count drops too low, he is at great risk of bleeding to death. (*See* Tr. pp. 1497-98).

[4] In HITT patients, Heparin, which is given to prevent clotting, has the opposite effect: it activates the platelets' clotting factor, causing the platelets to aggregate in clumps in the blood vessels. As a result, HITT decreases the patient's blood platelet levels while simultaneously causing potentially fatal thrombosis. (*See* Tr. pp. 266-69).

[7] Throughout the day on December 13, 1999, Hill continued to experience a decrease in his platelet count and the swelling in his left arm worsened, with his hand becoming "cool and blue." (Tr. p. 310). Dr. Lloyd ordered an ultrasound Doppler study for the following morning to auditorily evaluate the flow of blood in Hill's arm. On December 14, 1999, Dr. Csicsko, a board-certified cardiovascular surgeon, discovered that Hill had continued to receive Heparin through the flushing of his IV lines and discontinued the protocol. He ordered saline to be used instead.

[8] On December 15, 1999, at 1:00 a.m., the nursing notes indicated that Hill's "[r]ight foot is mottled and capillary refill is greater than three seconds. Both feet are cold to touch. . . . Left toes are cyanotic and blue appearing." (Tr. p. 313). At 1:30 a.m., the notes reflected that Hill's "[r]ight leg is swollen and firm from the ankle to the groin." (Tr. p. 315). At 8:30 a.m., the notes warned that Hill's left arm is swollen and blue. Dr. Jacob testified that all these symptoms reflect a worsening HITT. Later that day, Dr. Ryan consulted with Dr. David Goertzen (Dr. Goertzen), an orthopaedic surgeon, about the "extreme swelling in [Hill's] limbs" and his concern that "the swelling may compromise his arterial system." (Tr. p. 697). After the consultation, Dr. Goertzen performed a "fasciotomy," which is "a cutting of the skin to release the pressure on the skin and therefore allow the blood vessels not to be compromised by the swelling around it." (Tr. p. 697).

[9] On December 16, 1999, Hill's clinical assessment remained essentially unchanged and was considered to be "very critical" because "his limbs were

necrosing." (Def.'s Exh. H, p. 40). A consult with Dr. Rhinehart, a hematologist, was sought that morning. Dr. Rhinehart's "differential diagnosis was Acute Respiratory Distress Syndrome, sepsis, DIC." (Def.'s Exh. H, p. 38). To combat the presumed diagnosis of DIC, Dr. Rhinehart immediately ordered a 5,000 unit bolus of Heparin, to be administered intravenously, with an intravenous infusion of approximately 1,000 cc's of Heparin per hour for sixteen to seventeen hours thereafter. At certain times throughout the day, Dr. Rhinehart ordered the administration of additional platelets to control Hill's bleeding following his fasciotomy.

[10] On December 17, 1999, with Hill's condition unchanged, Dr. Rhinehart discontinued all Heparin and platelet infusions and requested "a Heparin induced antibody titer," a specific test to "measure the antibody" and a confirmatory diagnosis of whether a patient suffers from HIT or HITT. (Tr. p. 352). In 1999, the closest testing center was located in Milwaukee. On the same day, Dr. Rhinehart also ordered the administration of Refludan, "to prevent further clotting from occurring." (Tr. pp. 354-55). Once Refludan was administered, Hill's platelet count began to rebound.

[11] On December 20, 1999, the necrosis gangrene[5] and swelling in Hill's right leg and left arm were too extensive and Dr. Goertzen amputated the left arm just below the elbow and the right leg above the knee. Hill continued to experience

---

[5] Gangrene indicates the presence of dead tissue, which, in turn, attracts infection. "If you don't get rid of the dead tissue, you're going to die of infection." (Tr. p. 308).

swelling problems in his left leg and, on December 28, 1999, Dr. Goertzen amputated Hill's left leg above the knee. Hill remained in critical care at Parkview until December 31, 1999, when he was transferred to I.U. Medical Center for six weeks. In mid-February, 2000, Hill was released to the Rehabilitation Institute of Chicago where he received in-patient physical therapy before returning home in early April 2000.

[12]   On March 26, 2001, Parkview entered into a Settlement Agreement (Agreement) with Hill regarding all claims related to the health care provided by Parkview. Pursuant to the agreement, Hill released Parkview from liability in exchange for $250,000. On December 5, 2001, Hill filed a proposed Complaint for medical malpractice with the Indiana Department of Insurance pursuant to Ind. Code § 34-18-1-1. The Complaint alleged that Dr. Ryan, Drs. Lloyd and Csicsko, and Dr. Rhinehart violated their respective standards of care in providing Hill post-surgical care, resulting in the loss of three limbs. The medical review panel unanimously determined that the evidence did not support the conclusion that the doctors failed to comply with the appropriate standard of care.

[13]   On December 21, 2001, Hill entered into a Settlement Agreement and Release (Release) with the Indiana Patient's Compensation Fund (the Fund), which was later approved by the trial court. Pursuant to the Release, Hill released the

Indiana Department of Insurance from all claims arising from Hill's care and treatment while at Parkview in exchange for one million dollars.[6]

[14] In 2004, the physicians filed a joint Petition for Preliminary Determination, alleging the following: (1) Hill's Release with the Fund released all claims against the physicians; and (2) Hill had obtained the maximum amount of compensation permitted by the Indiana Medical Malpractice Act. The trial court subsequently denied the joint Petition. The physicians sought and were granted certification of the trial court's preliminary determination and declaratory judgment for interlocutory appeal, and this court accepted jurisdiction. In *Csicsko v. Hill*, 808 N.E.2d 80, 83 (Ind. Ct. App. 2004) trans. denied, we determined that the Release, when read as a whole, establishes that Hill and the Fund intended to release only the Fund from further liability arising out of the negligence settled by Parkview, not the physicians. In addressing the physicians' argument that Hill had already received the maximum amount allowed under the Act, we relied on *Miller v. Memorial Hosp. of South Bend, Inc.*, 679 N.E.2d 1329, 1331-32 (Ind. 1997), where our supreme court stated

> [The Medical Malpractice Act] authorizes only one recovery in those cases where a single injury exists, irrespective of the number of acts causing the injury. Conversely, there is no dispute that, if there are two separate and distinct injuries caused by two separate occurrences

---

[6] Under the Indiana Medical Malpractice Act, the total amount recoverable for a patient's injury or death cannot exceed $1.25 million. I.C. § 34-18-14-3(a)(3). Hill received an aggregate sum of $1.25 million from his settlements with Parkview and the Fund.

of malpractice, the statute does not preclude two separate recoveries (each separately limited in accordance with the Act).

Accordingly, in line with the dictates of *Miller*, we affirmed the trial court's decision because "a genuine issue of material fact exists as to whether the injuries Hill suffered, including the loss of many limbs, the failure of multiple organs, and the necessity of having to undergo several surgeries, constituted separate injuries from separate acts of malpractice under the Medical Malpractice Act." *Csicsko*, 808 N.E.2d at 84.

[15] In June 2011, Hill sought summary judgment to prevent the doctors' use of a $8.1 million settlement reached between Hill and pharmaceutical drug manufacturers as a setoff because the doctors failed to name the pharmaceutical companies as non-parties under I.C. §§ 34-51-2-17 & -18. In turn, the physicians requested summary judgment on the setoff, based on the common law principle that a plaintiff may only recover one full satisfaction irrespective of how many defendants are jointly liable. In December 2011, the trial court granted summary judgment in favor of Hill and against the doctors, concluding that the doctors could not setoff Hill's prior settlements against any malpractice verdict.

[16] On January 30, 2013, the physicians filed their second motion for summary judgment seeking a determination that because Hill had already received the maximum amount of recovery under the Medical Malpractice Act, Hill could not pursue his current malpractice claims unless he produced evidence

establishing separate and distinct injuries from the doctors' acts of malpractice. The trial court denied the summary judgment motion.

[17] On January 17 through 31, 2014, the trial court conducted a jury trial on Hill's claim of medical malpractice against the doctors. At the conclusion of Hill's case in chief, all four physicians moved for judgment on the evidence, asserting that Hill had failed to present any evidence establishing that the doctors had caused a separate and distinct injury from the injuries already compensated by Parkview and the Fund. The trial court entered judgment for Drs. Lloyd and Csicsko, but denied the motion with respect to Drs. Ryan and Rhinehart. At the close of the evidence, Drs. Ryan and Rhinehart renewed their motion, which was again denied. After submitting the cause to the jury, the jury returned a verdict in favor of Drs. Ryan and Rhinehart.

[18] Hill now appeals the judgment on the evidence in favor of Drs. Lloyd and Csicsko and the jury's verdict for Drs. Ryan and Rhinehart. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Judgment on the Evidence*

[19] Hill's main contention focuses on the trial court's directed verdict in favor of Drs. Lloyd and Csicsko. Pointing to four specific breaches in his care and treatment, Hill contends that the evidence supports that his "loss of limbs was proximately caused by the failure to properly treat [his] HIT which then turned

into HITT." (Appellant's Br. p. 28). Therefore, Hill maintains that his "case should have gone to the jury as to all defendants." (Appellant's Br. p. 32)

[20] The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence. *Levee v. Beeching*, 729 N.E.2d 215, 223 (Ind. 2000). The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Id*. Indiana Trial Rule 50 reads in pertinent part:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

[21] Upon review of the trial court's ruling on a motion for judgment on the evidence, we apply the same standard as the trial court, considering only the evidence and reasonable inferences most favorable to the nonmoving party. *Levee,* 729 N.E.2d at 223. Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim. *Id*. A judgment on the evidence is proper only when there is a total absence of evidence in favor of the plaintiff, that is, when the evidence is without conflict and is susceptible of only one inference and that inference is in favor of the defendant. *Id*. Likewise, judgment on the evidence is proper if the inference intended to be proven by the evidence cannot logically be drawn from the proffered evidence without undue speculation. *Id*.

[22] Because Hill had already received the total amount recoverable for an act of medical malpractice after entering into the Agreement with Parkview and the Release with the Fund, he can only obtain a "multiple cap recovery" by establishing that "there are two separate and distinct injuries caused by two separate occurrences of malpractice." *See* I.C. § 34-18-14-3; *Miller*, 679 N.E.2d 1332. Even if a patient suffers multiple acts of malpractice but manifests a single injury, the patient can pursue only one recovery under the Medical Malpractice Act. *See St. Anthony Med. Ctr. Inc. v. Smith*, 592 N.E.2d 732, 734-735, 739 (Ind. Ct. App. 1992) (only one recovery permitted when hospital performed a test which caused patient to suffer a stroke, and after being admitted to the hospital, the patient received an overdose of medication, dying two weeks later), *trans. denied*; *compare Miller*, 679 N.E.2d at 1329 (two recoveries permitted when physician caused prenatal brain damage to one part of the infant's brain, and hospital failed to properly treat the infant for zero blood glucose, causing a separate and distinct injury to a different part of the brain).

[23] Relying on Indiana's case law prohibiting a multiple cap recovery, the physicians moved for judgment on the evidence at the close of Hill's case in chief on the basis that Hill's injuries had been fully satisfied by Parkview and the Fund and the absence of evidence that the injuries allegedly caused by the doctors were separate and distinct from the injuries compensated by this Agreement and Release. During the hearing on the motion outside the presence of the jury, the trial court carefully delineated the evidence that had

been presented to the jury and that which had been received by the trial court outside the jurors' presence. Evaluating the evidence, the trial court held with respect to Dr. Lloyd:

> The question of Dr. Lloyd is a little more troubling than Dr. Csicsko. There's some evidence from Dr. Jacob that giving platelets contributed to the injuries but the second part of that is there's no evidence as to what injuries that caused. Even if the jury would believe only Dr. Jacob and none of the other experts, there's still no evidence to show that[,] so as to Dr. Lloyd, the Motion is **GRANTED**.

(Tr. pp. 2196-97). Next, regarding Dr. Csicsko, the trial court found:

> That's a different story. . . . Dr. Csicsko's negligence supposedly is that he didn't stop all Heparin. Perhaps it could be said that he should have done it on the 9th but he wasn't there. His first time was the 13th. So, I can't, joint and several all of that argument he made notwithstanding, I can't – the only thing [Hill] raised is that it's possible that the jury could find that he should have stopped all Heparin on the 13th. Again, the second part of that is if that's the case, what are the separate and distinct injuries that attributed to that act of negligence even if they believe only Dr. Jacob. There's no evidence of that so the Motion as to Dr. Csicsko is **GRANTED** as well.

(Tr. pp. 2197-98).

[24]     After viewing the totality of the evidence presented to the jury and the evidence read into the record by the trial court[7] at the close of Hill's case in chief, we cannot conclude that the trial court abused its discretion in granting a directed

---

[7] The trial court read the relevant parts of the Release with the Fund and the Agreement with Parkview into the record. Even though the settlements were not admitted as evidence or presented to the jury, they were considered by the trial court in making its determination on the doctors' motion because, as part of the motion, the Release and Agreement were "certainly before [the trial court] . . . " (Tr. p. 2183).

verdict in favor of Drs. Lloyd and Csicsko. Without having to analyze whether Hill satisfied the first prong of his burden of proof—whether the physicians performed a separate and distinct malpractice—we will address the second prong, *i.e.*, whether Hill incurred a separate and distinct injury from the one already satisfied by the Agreement entered into with Parkview and the Release with the Fund.

[25] With respect to the Agreement with Parkview, the trial court read

> Claimants, John Hill, III and Susan Hill, . . . Paragraph C says, . . ., "The Claimants allege that John Hill suffered at least two (2), and perhaps three (3) discrete injuries." I can only assume from that it's two (2) limbs or three (3) limbs and if I'm wrong, somebody will tell me. It goes on to say, "from discrete acts of medical malpractice. This is a disputed fact, resolution of which is not relevant to the Settlement Agreement between Claimants and Respondents, and it is recited in the Settlement Agreement for the sole purpose of articulating Claimants' position that they intend to pursue other remedies from other parties relating to the health care provided to John Hill in December 1999." . . . Paragraph D, the next paragraph [] says, "The parties desire to enter into this Settlement Agreement to provide, among other things, for certain payments in the aggregate sum of $250,000.00 in full settlement and discharge of all claims and actions of Claimants for damages due to, arising out of, or related to the above-referenced health care provided by [Parkview] on the terms and conditions set forth herein, with the following exceptions."

(Tr. pp. 2184-85). Regarding the Release with the Fund, the trial court noted as follows:

> In consideration of the payment set forth in Paragraph 1, Plaintiffs fully release, and forever discharge the Commissioner, the Indiana Department of Insurance, the [Fund], and their agents, employees, representatives, attorneys, officials from any and all past, present or future claims, demands, or cause of action, to recover monetary

damages, whether derivative or otherwise, whether based on tort, contract, or other theory of recovery, in which now exists or which may exist in the future on account of or in any way related to any and all known or unknown, foreseen or unforeseen, bodily and/or personal injuries suffered by Plaintiff as a result of the negligence settled by [Parkview] and described by Plaintiffs' counsel in his letter of March 22, 2001, which is attached as Exhibit A. This Release applies only to claims based upon the negligence of [Parkview].

* * *

[Exhibit A reads] Mr. Hill suffered the loss of both legs above the knee, the loss of the left arm immediately below the elbow, and multiple organ failure and surgeries, all as a result of negligent care and treatment while at [Parkview] until his release to the I.U. Medical Center at the end of December, 1999.

(Tr. pp. 2186-87). In other words, by entering into the Agreement with Parkview and the Release with the Fund, Hill received a settlement for the amputations of his three limbs as a result of negligent care and treatment. Therefore, to receive a multi-cap recovery under the Medical Malpractice Act, Hill was required to establish that Drs. Lloyd and Csicsko's breach of the standard of care resulted in injuries separate and distinct from these three amputations.

[26] Viewing the evidence most favorable to Hill, Dr. Jacob, Hill's expert, testified that Hill "sustained a loss of three limbs as a result of his care and treatment in this case." (Tr. p. 453). Although Dr. Jacob was unable to say precisely how much amputation would be required by the time the administration and flushes of Heparin was discontinued, he could not affirm that the prompt use of Refludan on December 14, 1999, could have "completely salvaged" Hill's limbs. (Tr. p. 454). Dr. Jacob also admitted to being "unable to define which

doctor was associated with which limb amputation." (Tr. p. 454). At no point during his day-long testimony, did Dr. Jacob indicate that Drs. Lloyd and Csicsko's breach of the standard of care resulted in injuries distinct and separate from the three limb amputations. In fact, nowhere in the record did Hill establish that he incurred any injuries separate and distinct from the amputations, which had already been compensated under the Agreement and Release. As Hill failed to satisfy his burden of proof, the trial court properly granted Drs. Csicsko and Lloyd's motion for judgment on the evidence.[8]

## II. *Joint and Several Liability*

[27]     Continuing his focus on the directed verdict, Hill next contends that the trial court erred by granting Drs. Lloyd and Csicsko's motion for judgment on the evidence because it prejudiced Hill by preventing the jury from "evaluating the liability of the doctors jointly and severally as a team." (Appellant's Br. p. 32). Hill maintains that after the directed verdict, the jury was unable to consider the actions of Drs. Lloyd and Csicsko, and consequently was prevented from considering the doctors "as collaborators and it prevented the failures of one of the doctors to be included with the failure of another." (Appellant's Br. p. 37).

---

[8] Drs. Ryan and Rhinehart were denied a directed verdict because evidence was presented indicating that their alleged breach of the standard of care possibly aggravated the degree of the amputation originally needed. Whether an aggravation of an injury originally satisfied by an agreement can be considered as a "separate and distinct injury" for purposes of the multi-cap recovery under the Medical Malpractice Act is not before us today and is better left for a future time.

Therefore, Hill requests this court to grant him a new trial as to all parties, "so that all parties may be tried as joint tortfeasors." (Appellant's Br. p. 37).

[28] It is well established that in medical malpractice actions, the Indiana Comparative Fault Act does not apply. *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind. 2006). Accordingly, the common law defenses remain available to defendants in cases alleging medical malpractice. *Id*. At common law, joint tortfeasors are two or more persons jointly or severally liable in tort for the same injury to person or property. *Flagg v. McCann Corp.*, 498 N.E.2d 76, 78 (Ind. Ct. App. 1986), *reh'g denied*. Their actions unite to cause a single injury. *Marquez v. Mayer*, 727 N.E.2d 768, 773-74 (Ind. Ct. App. 2000), *trans. denied*.

> When more than one unite in the commission of a wrong, each is responsible for the acts of all, and for the whole damage; also, where separate and independent acts of negligence by different persons concur in perpetrating a single injury, each is fully responsible for the trespass. Courts will not undertake to apportion the damage in such cases among the joint wrongdoers. The injured party has at his election his remedy against all, or any number.

*Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Hilligoss*, 86 N.E. 485, 487 (Ind. 1908) (citation omitted).

[29] Thus, to impose joint and several liability on Drs. Lloyd and Csicsko, it is imperative that these doctors contributed to the negligent actions which resulted in Hill's injury. In other words, joint and several liability does not impose liability on a defendant who is otherwise not liable. The fact that Drs. Csicsko and Lloyd contributed and collaborated with the two other doctors to jointly provide treatment to Hill does not equate to a transfer of liability of one doctor

to the non-liable physicians simply by virtue of their collaboration. As we concluded that the directed verdicts in favor of Drs. Csiscko and Lloyd were properly entered, Hill cannot now avail himself of the doctrine of joint and several liability to transfer any perceived negligence of Drs. Ryan and Rhinehart onto Drs. Lloyd and Csicsko.

[30] Moreover, the entry of the directed verdict did not prevent Hill from fully presenting his case. The doctors' motion for directed verdict was heard and ruled upon after Hill rested his case-in-chief. Accordingly, there was no prejudice to Hill in explaining the temporal relationship between the physicians and their respective collaborative actions with respect to Hill's care and treatment. Therefore, we deny Hill's request for a new trial.[9]

### III. *Jury Instruction No. 23*

---

[9] In his Appellate Brief, Hill also appears to challenge the trial court's refusal to tender his proposed instruction on joint and several liability to the jury. Hill's proposed instruction followed model instruction nos. 323 and 1519, and addressed the allocation of damages among negligent defendants who jointly contributed to the same injury. This proposed jury instruction instructed the jurors:

> If you decide that Defendants, [Dr. Rhinehart, Dr. Csicsko, Dr. Lloyd, Dr. Ryan] were all medically negligent and that their negligence contributed to the same injury, they are all liable for the entire amount of [Hill's] damages arising from that injury.
>
> If you decide that any combination of Defendants [Dr. Rhinehart, Dr. Csicsko, Dr. Lloyd, Dr. Ryan], were medically negligent, and that their combined negligence contributed to the same injury, then the Defendants whose combined negligence contributed to the same injury are all liable for the entire amount of [Hill's] damages arising from that injury.

(Appellant's App. p. 804). As the directed verdict in favor of Drs. Lloyd and Csicsko was properly rendered, the trial court did not abuse its discretion by refusing Hill's proposed jury instruction.

[31]   Lastly, Hill challenges the trial court's tender of Jury Instruction No. 23. Instructions serve to inform the jury of the law applicable to the facts presented at trial, enabling it to comprehend the case sufficiently to arrive at a just and correct verdict. *Blocher v. DeBartolo Properties Management, Inc.*, 760 N.E.2d 229, 235 (Ind. Ct. App. 2001), *trans. denied*. Jury instructions are committed to the sound discretion of the trial court. *Id*. In evaluating the propriety of a given instruction, we consider 1) whether the instruction correctly states the law, 2) whether there is evidence in the record supporting the instruction, and 3) whether the substance of the instruction is covered by other instructions. *Id*. However, if the instruction is challenged as an incorrect statement of the law, the applicable standard of review is *de novo* and we will not defer to the trial court's interpretation of the law. *Wal-Mart Stores, Inc., v. Wright*, 774 N.E.2d 891, 893 (Ind. 2001) reh'g denied. An erroneous instruction warrants reversal only if it could have formed the basis for the jury's verdict. *Canfield v. Sandock*, 563 N.E.2d 1279, 1282 (Ind. 1990) ("We will assume that the erroneous instruction influenced the jury's verdict unless it appears from the evidence that the verdict could not have differed even with a proper instruction.") reh'g denied.

[32]   The disputed Jury Instruction No. 23, originally submitted to the trial court as the doctors' proposed jury instruction No. 4, was tendered to the jury as follows:

> The law does not require that a physician guarantee that he will cure his patient or even that he will obtain a good result. The law does require that a physician possess and use that degree of skill and

> learning which is ordinarily possessed and used by a physician under the same or similar circumstances at the time of the treatment or service.
>
> Accordingly, a physician will not be negligent if he exercises such reasonable care and ordinary skill, even though he mistakes a diagnosis, makes an error during treatment, or fails to appreciate the seriousness of the patient's problem.

(Appellant's App. p. 1147). Claiming that the second paragraph of the Jury Instruction misstates the law, Hill maintains that "while the instruction states that the physician will not be negligent if he exercises ordinary care, it then goes on to say that specific types of error are not negligence." (Appellant's Br. p. 38). "Indeed, it appears that if the instruction is taken seriously by the jury, nothing is left that could possibly lead to a finding of negligence." (Appellant's Br. p. 38).

## A. Waiver

[33] However, the doctors respond that we do not need to reach the merits of Hill's contention as Hill failed to properly preserve the error he now claims. Indiana Trial Rule 51(C) proscribes that "[n]o party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The purpose of this trial rule is to protect the trial court's inadvertent error. *Terre Haute Regional Hospital, Inc. v. El-Issa*, 470 N.E.2d 1371, 1376 (Ind. Ct. App. 1984), *reh'g denied, trans. denied*. Thus, the objection to the instruction must be sufficiently specific to make the trial court aware of the alleged error before it reads the instruction to the jury. *Id*. Objections to

instructions must state why the instruction is misleading, confusing, incomplete, irrelevant, not supported by the evidence, or an incorrect statement of the law. *See Carrier Agency, Inc. v. Top Quality Bldg. Products, Inc.*, 519 N.E.2d 739, 744 (Ind. Ct. App. 1998), reh'g denied, *trans. denied*. An objection which is not specific preserves no error on appeal. *Johnson v. Naugle*, 557 N.E.2d 1339, 1341 (Ind. Ct. App. 1990). A party claiming error in the giving of an instruction is limited to his stated objection at trial. *Weller v. Mack Trucks, Inc.*, 570 N.E.2d 1341, 1343 (Ind. Ct. App. 1991).

[34] During the jury instruction conference, Hill objected to the tender of Jury Instruction No. 23 because "it's confusing to the jury. It essentially tells the jurors that any mistake is not necessarily negligence[.]" (Tr. p. 2341). As the trial court had "given this instruction before worded exactly like this," it tendered the Instruction to the jury over Hill's objection. (Tr. p. 2342). After the verdict, Hill filed a motion to correct error, challenging Jury Instruction No. 23 as it "presented the jury with an incorrect and/or misleading statement of Indiana Law with regard to the applicable standard by which the jury was to determine whether or not the defendants had committed medical negligence." (Appellant's App. p. 1193).

[35] While we agree that "an objection which merely asserts that an instruction is confusing or misleading is not specific enough to preserve error," here, Hill clarified his allegation. *See Poor Sisters of St. Francis Seraph of Perpetual Adoration, Inc. v. Catron*, 435 N.E.2d 305, 309 (Ind. Ct. App. 1982). After he objected during the conference and outside the presence of the jury that the proposed

instruction was confusing, Hill explained his objection by adding "[i]t essentially tells the jurors that any mistake is not necessarily negligence[.]" (Tr. p. 2341). Although not very artfully worded, it is clear that Hill disputed Jury Instruction No. 23 as a misstatement of the law of negligence. Therefore, because Hill timely and sufficiently objected to the tender of the Jury Instruction, we will now turn to the merits of Hill's challenge.

## B. Merits

[36] Evaluating the merits of Hill's contentions, we note that this is not the first time Indiana courts have been called upon to review the language of Jury Instruction No. 23. In *Dahlberg v. Ogle*, 373 N.E.2d 159, 163 (Ind. 1978), "[t]rial court gave an instruction which in part informed the jury that the defendant [physician] did not warrant or guarantee the success of his treatment." Our supreme court approved the instruction and advised that it was intended "to guide the jury away from reaching its verdict upon the mistaken conclusion that a physician warrants or guarantees the success of his treatment." *Id.*

[37] More recently, in *Fall v. White*, 449 N.E.2d 628, 635 (Ind. Ct. App. 1983), *reh'g denied*, we approved a virtually identical instruction, finding that it was a correct statement of law and was properly given. Citing to *Dahlberg* and *Edwards v. Uland*, 140 N.E. 546 (Ind. 1923), we stated:

> Our supreme court found that the failure of a physician to realize the actual seriousness of a condition is not negligence unless there are facts to indicate a lack of skill or lack of care in making the examination and diagnosis. Indiana has long recognized the principle that a physician's

mistaken diagnosis does not constitute negligence when the physician
has used reasonable skill and care in formulating such diagnosis.

*Fall*, 449 N.E.2d at 635 (internal references omitted). Two subsequent cases have cited to *Fall* for the proposition that a physician's conduct does not constitute negligence when the physician has used reasonable skill and care in formulating the diagnosis. *See Schultheis v. Franke*, 658 N.E.2d 932, 939 (Ind. Ct. App. 1995), *trans. denied*; *Farrar v. Nelson*, 551 N.E.2d 862, 865 (Ind. Ct. App. 1990), *reh'g denied, trans. denied*.

[38]     Hill references *LaPorte Cmty. School Corp. v. Rosales*, 963 N.E.2d 520, 525 (Ind. 2012), to support his contention that the tendered Instruction No. 23 is an incorrect statement of the law that left the jury in doubt as to the proper standard for determining medical malpractice. In *Rosales*, the trial court read to the jury a comprehensive elements instruction, which included a list of factual scenarios. *Id.* at 523. Compared with the general negligence instruction, our supreme court concluded:

> While [the] Instruction [] may have been intended to explain to the
> jury that the plaintiff had the burden of proving the elements of
> negligence, proximate cause, and damages, the language and phrasing
> of the instruction permitted the jury to infer that the factual allegations
> set forth [] should be understood as factual circumstances identified by
> the court, based on the facts of the case, that *automatically* constitute
> negligence if proven by a preponderance of the evidence. Such an
> interpretation effectively creates new duties not recognized by the
> common law in Indiana.

*Id.* at 524. "Even if the plaintiff's interpretation—that [the] Instruction set forth only the plaintiff's allegations of negligence and the parties' burdens of proof—is considered a reasonable alternative reading, the existence of competing

interpretations renders the instruction ambiguous and confusing[.]" *Id*. Accordingly, the *Rosales* court held the instruction to be an incorrect statement of the law as it left the jury in doubt as to the law on a material issue of the case. *Id*. at 525.

[39]     *Rosales* is easily distinguishable from the situation before us. First, *Rosales* is not a medical malpractice case, like *Fall*, *Dahlberg*, *Schultheis*, or *Farrar*. And second, the *Rosales* instruction included a series of facts specific to the case that our supreme court determined could have caused confusion vis-a-vis the general negligence instruction, whereas Jury Instruction No. 23 did not include any confusing factual recitations but rather amounted to a straightforward statement which focused on the proper standard of care for finding medical negligence. Reading all the jury instructions together, there was no risk of confusion as in *Rosales*.

[40]     In sum, Jury Instruction No. 23 reminds the jury that a poor outcome does not constitute negligence if the physician exercises the requisite standard of care. *Dahlberg*, 373 N.E.2d at 164. As doctors are not guarantors of medical outcomes, no error is committed by instructing the jury that a doctor does not commit medical negligence when he exercises the appropriate skill and learning, but makes a mistake in diagnoses. *See Fall*, 449 N.E.2d at 635. Read together with the other instructions, Jury Instruction No. 23 carefully delineated the standard for determining whether medical malpractice had been committed. Therefore, we conclude that Jury Instruction No. 23 was a correct statement of the law and properly tendered to the jury.

## CONCLUSION

Based on the foregoing, we conclude the trial court properly granted judgment on the evidence in favor of Drs. Lloyd and Csicsko; Hill was not prejudiced by the entry of the judgment on the evidence against two of the physicians; and the trial court properly tendered Jury Instruction No. 23 which advised the jury that physicians are not liable for an error in diagnosis or treatment when exercising reasonable care.

Affirmed.

Brown, J. and Altice, J. concur